RITA PEATIE *v.* WAL-MART STORES, INC.
(AC 28387)

Flynn, C. J., and Lavine and Dupont, Js.

Argued September 25, 2008—officially released January 6, 2009

*Heidi J. Alexander*, for the appellant (plaintiff).

*Anita M. Varunes*, with whom was *Timothy P. Knotts*, for the appellee (defendant).

*Opinion*

DUPONT, J. In this negligence action, the plaintiff, Rita Peatie, appeals from the judgment of the trial court, rendered after a jury verdict in favor of the defendant, Wal-Mart Stores, Inc. The plaintiff claims on appeal that the court improperly (1) bound her "in lieu of" attorney to the scheduling order agreed to by her previous attorney, (2) refused to lift a protective order, (3) excluded some of the testimony of her expert from the jury's consideration, (4) included a jury instruction regarding the calculation of economic damages and (5) was biased in favor of the defendant. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to the plaintiff's appeal. The plaintiff instituted this negligence action against the defendant on October 12, 2004. In her amended complaint, which is the operative complaint, the plaintiff alleged that while shopping at the defendant's store on October 10, 2002, she suffered multiple injuries when a metal cylinder unit attached to a vaulted ceiling fell and hit her on the head, neck and left shoulder. The plaintiff further alleged that the metal cylinder attached to the ceiling was in the control of the defendant and that the defendant was negligent in that it knew or should have known that the cylinder unit was not properly attached to the ceiling.

The evidentiary portion of the trial began on December 5, 2006. On December 8, 2006, the jury returned a verdict in favor of the defendant. The court accepted

the verdict and rendered judgment in favor of the defendant. The plaintiff did not make a motion to set aside the verdict.[1] This appeal followed.

I

The plaintiff's first claim is that the court improperly bound her "in lieu of" counsel to the scheduling orders agreed to by her previous counsel when it denied her May 12, 2006 motion for a continuance of the discovery deadlines. We disagree.

The following additional facts are relevant to the plaintiff's claim. On March 15, 2005, approximately five months from the date the action was initiated, a scheduling order was agreed to by the plaintiff's previous counsel and by counsel for the defendant. On August 1, 2005, new counsel for the plaintiff entered the case in lieu of her former counsel. On September 6, 2005, the plaintiff's new counsel made a motion for a 120 day extension of the entire scheduling order. The court did not rule on that motion. On January 17, 2006, the plaintiff's counsel filed a motion to continue a January 27, 2006 arbitration hearing date on the ground that discovery was not complete. The court granted the motion and continued the arbitration date to May 12, 2006. On that day, counsel filed another motion to continue the arbitration hearing on the ground that discovery still was not complete. The court denied that motion, and the arbitration hearing proceeded as scheduled.[2]

[1] The plaintiff, in both her brief and at oral argument before this court, admitted that she had made no such motion. The consequences of this omission will be discussed in parts III and IV, as the claims therein relate to rulings made during the trial. Parts I and II involve rulings on pretrial motions, which are not usually the subject of motions to set aside the verdict because motions to set aside the verdict ordinarily rest on the conduct of the proceedings as heard by the jury. Part V involves an allegation of bias on the part of the court, and, as set out within that section, there is a particular procedure for raising such claims.

[2] The arbitrator issued a decision in favor of the defendant on May 16, 2006. The plaintiff filed a motion for a trial de novo on June 1, 2006.

We first set forth our standard of review. "The trial court has a responsibility to avoid unnecessary interruptions, to maintain the orderly procedure of the court docket, and to prevent any interference with the fair administration of justice." (Internal quotation marks omitted.) *State* v. *Stevenson*, 53 Conn. App. 551, 562, 733 A.2d 253, cert. denied, 250 Conn. 917, 734 A.2d 990 (1999). In addition, "matters involving judicial economy, docket management [and control of] courtroom proceedings . . . are particularly within the province of a trial court." (Internal quotation marks omitted.) *Marshall* v. *Marshall*, 71 Conn. App. 565, 574, 803 A.2d 919, cert. denied, 261 Conn. 941, 808 A.2d 1132 (2002). Accordingly, "[a] trial court holds broad discretion in granting or denying a motion for a continuance. Appellate review of a trial court's denial of a motion for a continuance is governed by an abuse of discretion standard that, although not unreviewable, affords the trial court broad discretion in matters of continuances." (Internal quotation marks omitted.) Id.

"A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . To prove an abuse of discretion, an appellant must show that the trial court's denial of a request for a continuance was [unreasonable or] arbitrary . . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." (Internal quotation marks omitted.) *State* v. *Ross V.*, 110 Conn. App. 1, 7, 953 A.2d 945, cert. denied, 289 Conn. 939, 958 A.2d 1247 (2008).

In the present case, the May 12, 2006 motion for a continuance was the plaintiff's second such motion. The plaintiff's first motion for a continuance was granted by

the court and gave the plaintiff four additional months to complete discovery. In *State* v. *Marshall*, 51 Conn. App. 469, 473, 722 A.2d 122, cert. denied, 248 Conn. 901, 732 A.2d 178 (1999), we held that "[s]ince the trial court had already granted one continuance, we find no abuse of discretion in the court's refusal to grant the [party's] motion for a further continuance." See *State* v. *Yednock*, 14 Conn. App. 333, 344–45, 541 A.2d 887 (1988) (no abuse of discretion where court refused to grant further continuance after already granting one). Moreover, the plaintiff did not make the motion for a continuance until the morning the arbitration hearing was set to proceed. At that point, it would have been unfair to the defendant and to the arbitrator to postpone the hearing for a second time. We therefore conclude that the court acted within its discretion when it denied the plaintiff's May 12, 2006 motion for a continuance.

## II

The plaintiff's second claim is that the court, *Aurigemma, J.*, abused its discretion when it denied her motion in limine to lift a protective order that prevented her from deposing the defendant's custodian of records. We disagree.

The following additional facts are relevant to the plaintiff's claim. On October 13, 2006, the defendant filed a motion for a protective order in connection with the plaintiff's September 27, 2006 deposition notice and subpoena to the defendant's custodian of records to acquire photographs, records and reports held by the defendant regarding the plaintiff's alleged injury. The defendant asserted two grounds in support of its motion: (1) the proceedings in the case had been stayed, except to allow the defendant to depose the plaintiff's causation expert, David Kalayjian, an orthopedic surgeon, by a prior order of the court, *Dubay, J.*, dated September 26, 2006; and (2) the plaintiff did not certify

a copy of the notice of deposition to the defendant's attorney. The plaintiff did not file an objection to the motion, and it was granted by the court, *Aurigemma, J.*, on October 30, 2006.

On December 5, 2006, the first day of the evidentiary portion of the trial, the plaintiff filed a motion in limine to lift the defendant's protective order on the ground that no annoyance, embarrassment, oppression, or undue burden or expense were experienced by the defendant. The plaintiff also argued that because the defendant had conducted discovery beyond the guidelines set by Judge Dubay's order, it would only be fair to allow her to do so as well. The court, *Aurigemma, J.*, denied the plaintiff's motion, stating: "I just don't think [I've] heard any good reason why these . . . couldn't have been or weren't obtained in discovery well before September [2006], at which time, I would assume the discovery deadlines had long passed."

"[T]he [trial] court's inherent authority to issue protective orders is embodied in Practice Book § 13-5[3] . . . ." *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 276 Conn. 168, 221 n.59, 884 A.2d 981 (2005). "[D]iscovery related protective orders . . . are injunctive in nature. Such orders have both the force and effect of an injunction, and serve a similar equitable purpose, namely, to regulate prospectively the conduct of the parties, either by restraining them from acting or by requiring them to act under circumstances that, if not so regulated, could lead to unduly harmful consequences. . . . [O]nce issued, protective orders, like injunctions, need not remain in place permanently . . .

---

[3] Practice Book § 13-5 provides in relevant part: "Upon motion by a party from whom discovery is sought, and for good cause shown, the judicial authority may make any order which justice requires to protect a party from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had . . . ."

and their terms are not immutable. It is well-settled that a trial court retains the power to modify or lift a protective order that it has entered. . . . Indeed, courts and commentators seem unanimous in finding . . . [that courts have] an inherent power to modify discovery-related protective orders . . . when circumstances justify." (Citation omitted; internal quotation marks omitted.) Id., 214–15.

The use of protective orders and the extent of discovery is within the discretion of the trial judge. See *Lougee* v. *Grinnell*, 216 Conn. 483, 491, 582 A.2d 456 (1990), overruled in part on other grounds by *State* v. *Salmon*, 250 Conn. 147, 154–55, 735 A.2d 333 (1999) (en banc); *State* v. *Jacobs*, 70 Conn. App. 488, 502, 802 A.2d 857 (2002), vacated and remanded, 265 Conn. 396, 828 A.2d 587 (2003); *Verderame* v. *Pryor*, Superior Court, judicial district of New Britain, Docket No. CV-99-0496040-S (January 24, 2001) (*Kocay, J.*). "We have long recognized that the granting or denial of a discovery request . . . is subject to reversal only if such an order constitutes an abuse of that discretion. . . . [I]t is only in rare instances that the trial court's decision will be disturbed. . . . Therefore, we must discern whether the court could [have] reasonably conclude[d] as it did." (Internal quotation marks omitted.) *Barry* v. *Quality Steel Products, Inc.*, 280 Conn. 1, 16–17, 905 A.2d 55 (2006).

In the present case, as indicated in the court's discussion of its reasons for refusing to lift the protective order, the court granted the protective order in the first place because the discovery deadlines had passed. The September 26, 2006 order makes it clear that as of that date, the time for discovery had long been over, except that the defendant would be allowed to depose Kalayjian because the plaintiff had been tardy in disclosing him as her causation expert. The plaintiff's subpoena and notice of deposition to the defendant's custodian of records is dated September 27, 2006. The information

the plaintiff sought had not come to her attention suddenly.[4] By counsel's own admission, that information was available and had been known to her since she entered the case in August, 2005. Inherent in the court's granting of the protective order was a finding that allowing the plaintiff to engage in discovery well after the time for discovery had concluded and after she previously had been granted a four month continuance to complete discovery would annoy, if not oppress, the defendant.[5]

Moreover, it is important to note that the plaintiff did not file an objection when the defendant first filed the motion for the protective order and did not make the motion in limine to lift the protective order until the morning of the trial, a little more than one month from when it was issued. Had the court granted the motion, it would have been necessary to postpone the trial, which inevitably would have caused an undue hardship to the defendant, the court and the jury. Accordingly, the court did not abuse its discretion when it issued the protective order or when it denied the plaintiff's motion in limine to lift the protective order.

III

The plaintiff's third claim is that the court improperly precluded from the jury's consideration the testimony of her causation expert, Kalayjian, as to the causal connection between the incident at the defendant's store and the plaintiff's second surgery. We disagree.

---

[4] The information the plaintiff sought through the subpoena and notice of deposition to the custodian of records related to her attempt to show that the defendant had notice of a defect in the structure of the metal cylinder unit and its attachment to the ceiling. The plaintiff claimed that within minutes after she was hit with the object, an employee told her that the same piece had fallen two days prior. Presumably, if a prior accident had occurred, the maintenance records would be relevant.

[5] See Practice Book § 13-5.

The following additional facts are relevant to the plaintiff's claim. At trial, the plaintiff testified that due to the injury she suffered at the defendant's store, she was forced to have surgery on her left shoulder. She further testified that Kalayjian performed the surgery on April 2, 2003, and afterward, she regained use of her arm and that "it felt great." The plaintiff then added: "[Kalayjian] did a great job until I picked up a twelve pack Pepsi . . . ." The plaintiff testified that when she lifted the twelve pack of Pepsi, her shoulder "went pop" and she was in "severe pain." The plaintiff stated that she then had to have a second surgery on her left shoulder.

On direct examination, Kalayjian testified that after the plaintiff's first surgery, she came into his office for checkups on April 11, May 9 and August 1, 2003. At each checkup, he found that she had excellent motion with minimal discomfort. On February 7, 2005, however, the plaintiff came in and reported that she had recurring discomfort in her left shoulder. Kalayjian testified that due to this discomfort, he performed a second surgery on the plaintiff's left shoulder on April 11, 2005. Kalayjian further testified that he believed that both surgeries were causally connected to the plaintiff's injury at the defendant's store.

On cross-examination, the defendant's counsel asked Kalayjian if he was aware that the plaintiff had told another physician that after her first surgery, she was doing quite well until she lifted a twelve pack of Pepsi and felt a pop in her left shoulder, resulting in significant pain, and that that is when she returned to him for additional treatment of the left shoulder. Kalayjian responded that the plaintiff did not tell him when she came into his office on February 7, 2005, or on any other date, that she had felt a pop in her shoulder after lifting a twelve pack of Pepsi. The defendant's counsel then asked Kalayjian whether it would be fair to say

with a reasonable degree of medical probability that the plaintiff's second course of treatment for the left shoulder was in fact related to the lifting of the twelve pack of Pepsi, to which Kalayjian replied: "[T]hat was certainly . . . a major cause of it. Yes. I don't think it was a normal cuff before then, but I think the second she felt a pop when lifting the twelve pack, then that certainly would be a major cause."

On redirect examination, the plaintiff's counsel asked Kalayjian if his opinion as to the cause and relationship of the two surgeries had changed after hearing about the Pepsi incident. Kalayjian responded: "Well, somewhat. I think that the second surgery is not as directly related to the original injury as I thought it was, given the history that has been brought out." Kalayjian stated, however, that he still thought there was a relationship between the second surgery and the plaintiff's injury at the defendant's store. On recross-examination, Kalayjian clarified that the Pepsi incident "certainly was a substantial cause" of the plaintiff's second surgery.

The defendant then moved to preclude submission to the jury of evidence of the plaintiff's second surgery and the bills relating to that surgery on the ground that because Kalayjian had testified that the Pepsi incident was a major cause of the second surgery, there was no expert opinion that the second surgery was caused by the incident at the defendant's store. The plaintiff objected and argued that because Kalayjian stated on redirect that he would still relate the two causally, his opinion had not changed completely. The court granted the defendant's motion to preclude, stating: "Based on what I've heard, I will exclude the second surgery and all the bills related to the second surgery. I think [Kalayjian] indicated that it was a substantial factor for causing that surgery or the need for that surgery was the picking up of the Pepsi and that the arm was doing fine before she did. So, I am not going to allow those in."

When the jury reentered the courtroom, the court ordered it to disregard Kalayjian's testimony regarding the second surgery and the hospital bills relating to that surgery in assessing the damages to the plaintiff.

Before undertaking a discussion of the merits of the plaintiff's claim, we first must consider the impact of the plaintiff's failure to file a motion to set aside the verdict in accordance with Practice Book § 16-35[6] and General Statutes § 52-228b.[7] The defendant argues that this omission restricts our review of this claim to plain error. The plaintiff agrees. Both the plaintiff and the defendant, however, are incorrect.

Prior to 1996, a failure to make a motion to set aside a jury verdict did, in fact, limit our review to the standard of plain error. The reasoning in support of this rule was that § 52-228b "was designed to afford the trial court a full opportunity to redress any errors which may have occurred at trial before the appellate process is begun." *Pietrorazio* v. *Santopietro*, 185 Conn. 510, 515, 441 A.2d 163 (1981). In *Santopietro* v. *New Haven*, 239 Conn. 207, 220–21, 682 A.2d 106 (1996), our Supreme Court, overruling *Pietrorazio*, held that notwithstanding a party's failure to file a motion to set aside the verdict, when claims of error in trial rulings are preserved during the trial, they are entitled to plenary review.[8] In the present case, the plaintiff preserved her

---

[6] Practice Book § 16-35 provides in relevant part: "[M]otions to set aside a verdict . . . must be filed with the clerk within ten days after the day the verdict is accepted . . . . The clerk shall notify the trial judge of such filing. Such motions shall state the specific grounds upon which counsel relies."

[7] General Statutes § 52-228b provides in relevant part: "No verdict in any civil action involving a claim for money damages may be set aside except on written motion by a party to the action, stating the reasons relied upon in its support, filed and heard after notice to the adverse party according to the rules of the court. . . ."

[8] The court explained: "[T]he initial appellate determination of whether to review a claimed improper ruling of the trial court in a plenary fashion or under the plain error doctrine is more than a matter of phraseology. Determining whether a trial court has committed plain error that requires

claim during the trial. Therefore, we are not restricted to plain error review because of her failure to move to set aside the verdict.

We will now discuss the merits of the plaintiff's claim that the court improperly precluded her expert's testimony as to her second surgery. "The trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the error is clear and involves a misconception of the law, its ruling will not be disturbed. . . . In order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion. . . . Some facts must be shown as the foundation for an expert's opinion, but there is no rule of law declaring the precise facts which must be proved before such an opinion may be received in evidence." (Internal quotation marks omitted.) *Wallace* v. *St. Francis Hospital & Medical Center*, 44 Conn. App. 257, 259–60, 688 A.2d 352 (1997).

---

reversal is quite different from determining whether a trial court has made a ruling that is legally incorrect and that is sufficiently harmful to require reversal of the judgment. Where claims of trial court impropriety have been properly preserved and, therefore, are entitled to plenary review, we determine whether the ruling of the trial court is legally correct and, if it is not, whether the error was likely to have affected the verdict. . . .

"In determining whether there has been plain error, however, our scope of review is much more circumscribed. Plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . In any given case, therefore, rulings of the trial court that, if reviewed in a plenary fashion, would be judged to be legally incorrect and harmful enough to require reversal of the judgment could, if considered only under the plain error doctrine, be considered not to be so egregiously incorrect as to constitute plain error requiring reversal. In effect, then, confining an appellate claim to the plain error rubric means that, for reasons of policy, we are willing to take the appellate risk of sanctioning a legally flawed trial court judgment." (Citations omitted; internal quotation marks omitted.) *Santopietro* v. *New Haven*, supra, 239 Conn. 216. A plain error review is thus less likely to result in a reversal of a judgment than a plenary review.

"To be entitled to damages a plaintiff must establish a causal relation between the injury and the physical condition which he claims resulted from it. . . . This causal connection must rest upon more than surmise or conjecture. . . . A trier is not concerned with possibilities but with reasonable probabilities. . . . The causal relation between an injury and its later physical effects may be established by the direct opinion of a physician, by his deduction by the process of eliminating causes other than the traumatic agency, or by his opinion based upon a hypothetical question." (Citations omitted; internal quotation marks omitted.) *Struckman* v. *Burns*, 205 Conn. 542, 554, 534 A.2d 888 (1987).

"Expert opinions must be based upon reasonable probabilities rather than mere speculation or conjecture if they are to be admissible in establishing causation. . . . To be reasonably probable, a conclusion must be more likely than not. . . . Whether an expert's testimony is expressed in terms of a reasonable probability that an event has occurred does not depend upon the semantics of the expert or his use of any particular term or phrase, but rather, is determined by looking at the entire substance of the expert's testimony. . . . As long as it is clear that the opinion of the expert is expressed in terms of probabilities, the opinion should be submitted into evidence for a jury's consideration." (Citation omitted; internal quotation marks omitted.) *State* v. *Nunes*, 260 Conn. 649, 672–73, 800 A.2d 1160 (2002). Similarly, if the expert's opinion is not stated with the requisite standard of reasonable medical probability, it is inadmissible and should not be submitted for a jury's consideration. See *Aspiazu* v. *Orgera*, 205 Conn. 623, 633, 535 A.2d 338 (1987) (before court could allow jury to consider expert's report as probative on causation, it had to be persuaded that physician was confident relationship between injury and treatment reasonably probable).

Our review of the record in the present case reveals that the court did not abuse its discretion in precluding Kalayjian's testimony regarding the second surgery from the jury's consideration. As part of her request for economic damages, the plaintiff sought compensation for the hospital bills relating to the second surgery. Therefore, the plaintiff had to establish through her expert, Kalayjian, that on the basis of reasonable medical probability, there was a causal relation between the injury she suffered at the defendant's store and the second surgery. Kalayjian was the only witness to testify that the need for the second surgery stemmed from the plaintiff's injury at the defendant's store. Kalayjian, however, after being informed of the Pepsi incident on cross-examination, stated that the second surgery was "not as directly related to the original injury" as he originally thought and that the Pepsi incident would have been a major cause of the second surgery. Although he did state on redirect that he still believed that the incident at the defendant's store was related to the second surgery, he did not express it in terms of probabilities, and, therefore, he did not state his opinion with the requisite standard of reasonable medical probability. If the Pepsi incident was a "major cause" of the surgery, the jury would need to know how to apportion cause to the incident at the defendant's store. As there was no testimony to that effect, the jury would have been left to speculation. Accordingly, we conclude that the court properly instructed the jury to disregard Kalayjian's testimony as to the cause of the second surgery.

## IV

The plaintiff's fourth claim on appeal is that the court improperly included an instruction concerning the calculation of economic damages that was not discussed during the charging conference.[9] We disagree.

---

[9] As with the plaintiff's third claim, because the plaintiff properly preserved this claim at trial, we will accord it a full review despite the fact that she failed to move to set aside the verdict.

The following additional facts are relevant to the plaintiff's claim. During its charge to the jury, the court, in discussing damages, stated: "The plaintiff is entitled to recover as damages her fair and reasonable medical expenses, including expenses for hospital care, doctor's bill, physical therapist bill, home health care bill. I believe I heard something in the [attorneys' closing] arguments to the effect that there is some sort of a tripling or doubling process that is involved in awarding economic damages. This is not our law. If you determine [that] the plaintiff is entitled to recover damages, she's entitled only to recover fair, just and reasonable economic damages which consist of the amount of her medical bill, not the double or triple amount of her medical bills and other out-of-pocket expenses incurred as a result of the negligence of the defendant."

After the court concluded its charge, counsel for the plaintiff took exception to the comment, stating: "At some point, you were indicating something about the doubling or tripling of damages and that I had argued that it's for economic damages. That wasn't what I was arguing. I said that you could use . . . that amount and double . . . or triple it for pain and suffering when I was discussing noneconomic damages." The court replied: "Okay. Well . . . I was talking about economic because that's what I thought you said."

"We first set forth the well established standard of review for a challenge to the propriety of a jury instruction. . . . The test to determine if a jury charge is proper is whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . [W]e must determine whether the jury instructions gave the jury a reasonably clear comprehension of the issues presented for their determination under the pleadings and upon the evidence and were suited to guide the jury in the determination of those issues. . . . [I]n our task of

reviewing jury instructions, we view the instructions as part of the whole trial. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Moreover, [a] refusal to charge in the exact words of a request will not constitute error if the requested charge is given in substance." (Citation omitted; internal quotation marks omitted.) *Ravenswood Construction, LLC* v. *F. L. Merritt, Inc.*, 105 Conn. App. 7, 11–12, 936 A.2d 679 (2007).

We are convinced that the court's instruction was not improper. In her closing argument, counsel for the plaintiff stated: "With regard to the injury itself, I usually go in guidance with the medical bills, and I gave a number two or three times of what the medical bills are." It was logical for the court to believe that counsel was arguing that her client was entitled to two or three times the medical bills in economic damages, as counsel stated that these damages pertain to the "injury itself . . . ." Because counsel's argument was not a correct statement of our law, it was appropriate for the court to instruct the jury that our law does not provide for the doubling or tripling of her medical bills in economic damages. This instruction was correct in law and provided proper and necessary guidance for the jury.

V

The plaintiff's fifth and final claim is that there was bias on the part of the court. The plaintiff did not file a motion for a recusal, disqualification or mistrial. On appeal, the plaintiff alleges that the four rulings previously discussed demonstrate bias on the part of the court because each of them was in favor of the defendant and each was improper. We disagree.

"Ordinarily, we will not review a claim of judicial bias on appeal unless that claim was properly presented to the trial court through a motion for disqualification

or a motion for a mistrial. . . . Because an accusation of judicial bias or prejudice strikes at the very core of judicial integrity and tends to undermine public confidence in the established judiciary . . . we nonetheless have reviewed unpreserved claims of judicial bias under the plain error doctrine. . . . The plain error doctrine [however] is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . The plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Citation omitted; internal quotation marks omitted.) *Mercer* v. *Cosley*, 110 Conn. App. 283, 290–91, 955 A.2d 550 (2008).

"Canon 3 (c) (1) of the Code of Judicial Conduct provides in relevant part: A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (A) the judge has a personal bias or prejudice concerning a party . . . . To prevail on its claim of a violation of this canon, the plaintiff need not show actual bias. The plaintiff has met [her] burden if [she] can prove that the conduct in question gave rise to a reasonable appearance of impropriety. . . .

"We use an objective rather than a subjective standard in deciding whether there has been a violation of canon 3 (c) (1). Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably

be questioned is a basis for the judge's disqualification. Thus, an impropriety or the appearance of impropriety . . . that would reasonably lead one to question the judge's impartiality in a given proceeding clearly falls within the scope of the general standard . . . . The question is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his . . . impartiality, on the basis of all of the circumstances." (Citation omitted; internal quotation marks omitted.) *Burton* v. *Mottolese*, 267 Conn. 1, 30, 835 A.2d 998 (2003), cert. denied, 541 U.S. 1073, 124 S. Ct. 2422, 158 L. Ed. 2d 983 (2004).

Our review of the plaintiff's claim of bias reveals that the ground asserted amounts to nothing more than a claim that the court's rulings were improper because they were not in her favor. Yet, "[a]dverse rulings do not themselves constitute evidence of bias." *State* v. *Fullwood*, 194 Conn. 573, 582, 484 A.2d 435 (1984). Obviously, if a ruling against a party could be used as an indicia of bias, at least half of the time, every court would be guilty of being biased against one of two parties. Moreover, the "fact that a trial court rules adversely to a litigant, even if some of these rulings were determined on appeal to have been erroneous, [still] does not demonstrate personal bias." *Bieluch* v. *Bieluch*, 199 Conn. 550, 553, 509 A.2d 8 (1986). Notably, in this case, we already have determined that not one of the four rulings of which the plaintiff complains was erroneous. We refuse to attribute those rulings to personal bias or prejudice on the part of the court.[10]

---

[10] We note that in her oral argument, the plaintiff's counsel went so far as to claim that the trial court demonstrated bias by not reading her briefs. When asked what evidence she had to support this claim, counsel responded that if the court had considered her briefs, it would not have ruled as it did.

We remind counsel that "a charge of bias must be deemed at or near the very top in seriousness, for bias kills the very soul of judging—fairness." (Internal quotation marks omitted.) *Wendt* v. *Wendt*, 59 Conn. App. 656, 693, 757 A.2d 1225, cert. denied, 255 Conn. 918, 763 A.2d 1044 (2000). "[A]

Further, the plaintiff has not demonstrated that she suffered manifest injustice such that would warrant a finding of plain error.

The judgment is affirmed.

In this opinion the other judges concurred.

---

charge of . . . bias against a trial judge in the execution of his or her duties is a most grave accusation. It strikes at the very heart of the judiciary as a neutral and fair arbiter of disputes for our citizenry. Such an attack travels far beyond merely advocating that a trial judge ruled incorrectly as a matter of law or as to a finding of fact, as is the procedure in appellate practice. A judge's personal integrity and ability to serve are thrown into question, placing a stain on the court that cannot easily be erased. Attorneys should be free to challenge, in appropriate legal proceedings, a court's perceived partiality without the court misconstruing such a challenge as an assault on the integrity of the court. Such challenges should, however, be made only when substantiated by the trial record." (Internal quotation marks omitted.) Id., 697.

In *Evans* v. *Commissioner of Correction*, 37 Conn. App. 672, 676–77 n.6, 657 A.2d 1115, cert. denied, 234 Conn. 912, 660 A.2d 354 (1995), we cautioned a party who questioned whether a habeas judge had read certain materials not to cast aspersions inadvertently on the court. In *Wendt*, in which the plaintiff's counsel cited to four adverse rulings as evidence of the court's gender bias and failed to refer to a single supporting factual ground, we stated: "[T]he plaintiff's counsel not only ignores our warning in *Evans*, but crosses the invisible line delineating ethical and unethical conduct. Unlike counsel in *Evans*, her attack is by no means inadvertent, but a direct, groundless assault on the integrity of the trial court. It is an elementary rule of law that the fact that a trial court rules adversely to a litigant . . . does not demonstrate personal bias." (Internal quotation marks omitted.) *Wendt* v. *Wendt*, supra, 59 Conn. App. 694. We further issued "a cautionary warning for any member of the bar who may in the future consider making such an unsupported line of attack"; id., 696; and suggested that the plaintiff's counsel review rule 8.2 of the Rules of Professional Conduct, which states that "[a] lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge . . . ." Id., 697.

In the present case, counsel's argument of bias is completely unsubstantiated by the trial record. Counsel has come dangerously close to crossing the invisible line delineating proper and improper conduct, as outlined in *Evans* and *Wendt*.