# CATHERINE LEDERLE *v.* STEVAN SPIVEY
## (AC 28838)

McLachlan, Lavine and West, Js.

Argued January 6—officially released March 17, 2009

*Richard G. Kent,* for the appellant (defendant).

*Gary I. Cohen,* for the appellee (plaintiff).

*Mark H. Henderson,* guardian ad litem for the minor child.

*Opinion*

McLACHLAN, J. In this dissolution of marriage action, the defendant, Stevan Spivey, appeals from the judgment of the trial court. On appeal, the defendant claims that the court improperly (1) permitted the plaintiff, Catherine Lederle, to relocate with their minor child to Virginia, (2) ordered him to pay a penalty for missed visitations, (3) awarded sole legal and physical custody to the plaintiff and (4) ordered him to maintain life insurance beyond the child's attainment of the age of majority. We affirm the judgment of the trial court.

The court reasonably found the following relevant facts. The parties were married in Darien on December 31, 1998. The parties had one minor child, born April 29, 2000. The parties' marriage had broken down irretrievably, and there was no reasonable prospect of reconciliation.[1]

The plaintiff was employed in marketing and sales, and her income was $210,000 in 2006.[2] Approximately six months after beginning work with her current

---

[1] Practice Book § 67-4 (c) requires an appellant to include in its brief: "A statement of the nature of the proceedings and of the facts of the case bearing on the issues raised. The statement of facts shall be in narrative form, shall be supported by appropriate references to the page or pages of the transcript or to the document upon which the party relies, and shall not be unnecessarily detailed or voluminous." The defendant included a statement of facts of less than one page that did little more than provide an extremely cursory recitation of some procedural history. It is important to note that "[b]y complying substantially with Practice Book § 67-4, appellants better enable this court to consider their claims with efficiency and judiciousness." *Cichocki* v. *Quesnel*, 74 Conn. App. 299, 301 n.2, 812 A.2d 100 (2002). "While a failure to comply fully with [Practice Book § 67-4 (c)] may preclude appellate review . . . such review, while more difficult, may nevertheless be appropriate." (Internal quotation marks omitted.) *Cable* v. *Bic Corp.*, 79 Conn. App. 178, 179 n.1, 830 A.2d 279 (2003), aff'd, 270 Conn. 433, 854 A.2d 1057 (2004).

The plaintiff provided no statement of the nature of the proceedings or of the facts in her brief.

[2] In 2004 and 2005, the plaintiff earned $57,969 and $81,023, respectively.

employer, Lexmark, in 2004, the plaintiff's sales territory was changed from Danbury to Washington, D.C., Virginia, West Virginia and North Carolina. The plaintiff needed to be on-site during the sales process to facilitate the sale, to consult with customers and to observe the customer's work flow. The plaintiff also needed to be available to her customers after the installation of hardware to ensure that their systems functioned and to monitor for upgrades and the integration of new products. The plaintiff believed that if she was not permitted to relocate to Richmond, Virginia, she would be unable to compete for advancement in leadership and management roles within the company. If and when the plaintiff achieved a management position, she would be able to earn commissions on the basis of the sales of her subordinates.

The defendant held jobs with at least eight different companies since the parties married. At the time of judgment, the defendant worked as a sales representative and operated out of a home office. The defendant had two children, ages fifteen and nineteen, from his first marriage. The defendant's first divorce was acrimonious and led to disputes over the payment of child support and alimony during his second marriage. The defendant discussed with several people different ways of hiding income from his first wife as a method of reducing his financial obligations to her. Prior to trial, the defendant had been depositing his paycheck into his mother's bank account because, according to him, his bank account was seized by the Internal Revenue Service for tax liabilities.[3]

The parties' child suffered from a number of medical problems, one of which caused seizures and could

---

[3] In 2003, the parties did not have taxes withheld from the plaintiff's income for cash flow reasons. The plaintiff believed that the defendant had filed appropriate extensions and payment plan applications until her 2005 tax refund was seized by the Internal Revenue Service and she was billed $17,000.

require prompt medical attention. Since the child's diagnosis in 2004, the plaintiff had observed seventeen to twenty seizures. She had developed, for school officials, baby-sitters, day care and other care providers, a package of information regarding symptoms, when emergency help must be sought, the names of the child's medical providers and emergency contact numbers. The defendant had never witnessed one of his son's seizures. The parties had disputes about their child's medications, with the defendant claiming that the plaintiff gave the defendant insufficient medicine, the plaintiff claiming that the defendant was not available for the exchange of medication,[4] one parent throwing the medication at the other and other similar claims. Their child witnessed some of the altercations between the parties regarding his medication. The parties also required court orders to determine when each could be present during a medical procedure that required the child to stay in the hospital for twenty-four hours.

The parties also had disputes over the child's sports activities, his religious training, parenting time during the summer vacation prior to trial, a party scheduled during the defendant's parenting time and the subject of the child's "show and tell" at school. It is clear that the parties have different parenting styles, with the plaintiff being more protective and cautious than the defendant.[5]

Attorney Mark H. Henderson was appointed the child's guardian ad litem by the court in 2005. Henderson met with both parties on several occasions, met

---

[4] The child's school did not allow prescription medications to be exchanged via a child.

[5] The plaintiff objected to the defendant's decision to allow the child to swim without adult supervision, go out on a lobster boat, help load a wood stove and ride a razor scooter. The plaintiff was also concerned about the child's access to power tools in the defendant's house. The court stated that "[w]hile her complaints might be minor with most children, the fact that [the child] suffers from epilepsy is often minimized or ignored by [the defendant]."

with their child, made home visits and attended an appointment with the child's physician. Henderson considered the plaintiff to be the primary caregiver and the maker of decisions regarding religion, medical care and education. Henderson noted that the plaintiff was very well informed regarding her son's health, but the defendant "downplayed" the significance of his son's health issues. Henderson also observed that parental collaboration was very limited and that the defendant was primarily responsible for the lack of timely resolution of parenting issues. Henderson recommended sole custody be awarded to the plaintiff.[6] Henderson also recommended that her request to relocate to Richmond, Virginia, be granted because (1) the employment opportunity was genuine, (2) the defendant did not financially support the child during the pendente lite period, (3) the plaintiff was legitimately anxious about the cost of living in Fairfield County, (4) the plaintiff had sufficient flexibility to make a long distance visitation schedule work, (5) the plaintiff was committed to continuing the father-son relationship despite the relocation and (6) the child was young enough to make the move and still enjoy a close relationship with the defendant.

Phyllis Cummings-Texeira, a family relations counselor, completed a custody study recommending that if sole custody was awarded to one parent, the plaintiff should have sole custody. Cummings-Texeira concluded that the plaintiff was the primary caregiver, meeting the day-to-day and extraordinary needs of the child. Cummings-Texeira stated that relocation to Richmond, Virginia, was in the child's best interest because (1) the plaintiff was his primary caretaker, (2) the plaintiff had valid reasons to relocate, (3) the relocation was not an attempt to remove the child from the defendant

---

[6] Henderson's recommendation was based, in part, on the parties' pretrial requests for sole custody, which would prevent the court from awarding joint custody.

to harm their relationship, (4) the plaintiff had concerns about providing a good, stable life for her son and concerns about the cost of living in Fairfield County, (5) the plaintiff wanted to move to advance her career and to have job stability, (6) the plaintiff had concerns about being able to pay her child's medical expenses and (7) although the defendant was not ordered to, he did not pay child support or pay any of the child's medical expenses of approximately $18,000.

The court found that it was in the child's best interest to have the plaintiff serve as the sole custodial parent. The court stated that the defendant loved his son, but "as evidenced by his communication and inability to co-parent with the plaintiff, he is angry and self-absorbed and has also deprived [his son] of financial resources." The court also found that the defendant "[was] not always attuned to the child's emotional needs." The court found that the plaintiff "has always had a loving and affectionate relationship with the child and, since [he] was born, has fully met all of his day to day needs. Moreover, compared with the defendant, she is more nurturing and supportive in her parenting style, more aware of the child's medical, emotional and psychological needs and more responsive to his overall needs. Finally, the plaintiff will not hinder the relationship between father and son, whereas the defendant's refusal to compromise on parenting issues will end in a stalemate with [his son] being left in limbo until a court makes a decision."

The court also found that "the defendant's conduct during the entire course of litigation shows him to be untrustworthy and unreliable in his financial dealings with the plaintiff. The defendant was not candid in his financial disclosures to the court or the plaintiff, he was not candid in his financial disclosures to his first wife, and the court has no evidence that his behavior

will not continue unabated until the child reaches adulthood. . . . [The defendant] has been vindictive toward [the plaintiff] in making parenting decisions, exchanging medicine and the like, without regard of the effect his behavior would ultimately have on his son."

The court also found that "the defendant has both the means and opportunity to maintain frequent contact with [his son]. . . . The defendant has changed jobs nearly every year during the course of the marriage and currently works from his home. Nothing about the nature of his business limits its geographical reach. He has sufficient financial resources to go to Virginia frequently to see his child and sufficient control over his work schedule to do so. The court's orders regarding his parenting time will thus offer him significant access to his son and will not marginalize his role as a father."

The court also found testimony persuasive that "the plaintiff will do a good job of helping [her son] integrate into his new environment. The plaintiff's nurturing and supportive style will help the child through the transition. Although close to his father's relatives [in Connecticut, the child] will be close to his extended maternal family in Virginia . . . . [The child] has been cared for by his maternal grandparents, on whom the plaintiff will sometimes rely for child care in Virginia."

The court found that it was in the best interest of the child to relocate to Richmond, Virginia, with the plaintiff. "The child's own interests in sustained growth, development, and well-being require that the custodial parent be able to offer him a secure and stable home life, unfettered by the financial instability and constant acrimony and disputes regarding parenting decisions she would likely endure by remaining [in Connecticut]."

The court ordered the dissolution of the parties' marriage, awarded sole legal and physical custody of the

child to the plaintiff with liberal and reasonable visitation for the defendant and permitted the plaintiff to move to Richmond, Virginia.

## I

The defendant first claims that the court abused its discretion by ordering that the plaintiff could relocate to Richmond, Virginia, with the minor child.[7] Specifically, the defendant claims that the record did not support a finding that the move was in the child's best interest.[8] We disagree.

---

[7] The defendant argues that "[t]he record, viewed as a whole, does not furnish the *compelling evidence* necessary to determine that the proposed move was for a legitimate purpose and in the best interests of the child." (Emphasis added.) We have never required such a finding by the court to be supported by "compelling evidence," and the defendant has provided no argument for adopting that standard. Instead, we review the court's decision to determine whether it abused its discretion. See *Ford* v. *Ford*, 68 Conn. App. 173, 187, 789 A.2d 1104, cert. denied, 260 Conn. 910, 796 A.2d 556 (2002).

Additionally, the defendant claims that the record did not support a finding that the move had any legitimate purpose. As set forth below, this inquiry, part of the burden shifting scheme announced in *Ireland* v. *Ireland*, 246 Conn. 413, 717 A.2d 676 (1998), has no place in a relocation issue that is part of an initial dissolution proceeding. See *Ford* v. *Ford*, supra, 68 Conn. App. 184.

[8] We note that the defendant devotes nearly thirty pages of his brief to this claim and includes multitudinous claims and arguments with little factual reference or legal analysis. Those which are not discussed were not sufficiently presented for our review, and we decline to address them. See, e.g., *State* v. *DeJesus*, 288 Conn. 418, 470 n.33, 953 A.2d 45 (2008).

In his statement of issues, the defendant's first three issues are: "(1) Did the trial court err in allowing the plaintiff to relocate with the parties' minor child from New Canaan, Connecticut to Richmond, Virginia? (2) Did the trial court err in requiring the defendant, a resident of Connecticut, to exercise all of his semi-monthly visitation rights with the minor child in the [Commonwealth] of Virginia as opposed to Connecticut? (3) Did the trial court err in granting the plaintiff's request for permission to relocate from Connecticut to Virginia against the defendant's wishes and yet imposing upon the defendant the entire cost of the defendant's visitations with the minor child in Virginia as well as round-trip travel expenses of the minor child to and from Connecticut?"

The defendant folded all three inquiries into his first argument section, stating that the court erred in permitting the plaintiff to relocate and in ordering him to visit his child only in Virginia and to pay all costs of visitation.

"Our standard of review of a trial court's decision regarding custody, visitation and relocation orders is one of abuse of discretion. . . . [I]n a dissolution proceeding the trial court's decision on the matter of custody is committed to the exercise of its sound discretion and its decision cannot be overridden unless an abuse of that discretion is clear. . . . The controlling principle in a determination respecting custody is that the court shall be guided by the best interests of the child. . . . In determining what is in the best interests of the child, the court is vested with a broad discretion. . . . [T]he authority to exercise the judicial discretion under the circumstances revealed by the finding is not conferred upon this court, but upon the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court. . . . A mere difference of opinion or judgment cannot justify our intervention. Nothing short of a conviction that the action of the trial court is one which discloses a clear abuse of discretion can warrant our interference. . . .

In this argument section, the defendant advances a complicated calculation of the costs of round trip airfare, hotel rooms, car rentals, meals, entertainment, etc., that he would incur as a result of the visitation orders. His calculations, however, contain no citations to the record and are couched in terms such as "[i]f one assumes that the average round-trip flight would be $250 . . . ." We are not at liberty to make such assumptions. As an appellate court, we are not permitted to find new facts. *Blatt* v. *Board of Assessment Appeals*, 63 Conn. App. 512, 515, 776 A.2d 1187 (2001). The defendant had the opportunity to present evidence of those costs at trial. He may not raise them for the first time on appeal. See, e.g., *Griswold Airport, Inc.* v. *Madison*, 289 Conn. 723, 726 n.4, 961 A.2d 338 (2008). Furthermore, we can discern no *legal analysis* contained within the discussion of the supposed expenses. Accordingly, we decline to review his claim. See *Knapp* v. *Knapp*, 270 Conn. 815, 823 n.8, 856 A.2d 358 (2004).

In addition, the defendant argues that the court gave no consideration to whether the plaintiff's goals could be achieved by relocation to a town such as Newark, Delaware. The defendant, however, provides no reference to any time when he raised such an argument before the court. Accordingly, we must presume that no such argument was raised at trial. The defendant may not raise such an argument for the first time on appeal. See, e.g., *Griswold Airport, Inc.* v. *Madison*, supra, 289 Conn. 726 n.4.

"The trial court has the opportunity to view the parties first hand and is therefore in the best position to assess the circumstances surrounding a dissolution action, in which such personal factors as the demeanor and attitude of the parties are so significant. . . . [E]very reasonable presumption should be given in favor of the correctness of [the trial court's] action. . . . We are limited in our review to determining whether the trial court abused its broad discretion to award custody based upon the best interests of the child as reasonably supported by the evidence. " (Citations omitted; internal quotation marks omitted.) *Ford* v. *Ford*, 68 Conn. App. 173, 187–88, 789 A.2d 1104, cert. denied, 260 Conn. 910, 796 A.2d 556 (2002).

Prior to *Ireland* v. *Ireland*, 246 Conn. 413, 717 A.2d 676 (1998), "the courts utilized the best interest of the child standard, as set forth in [General Statutes] § 46b-56 (b), in deciding relocation issues. Section 46b-56 (b) provides in relevant part: In making or modifying any order with respect to custody or visitation, the court shall (1) be guided by the best interests of the child . . . ."[9] (Internal quotation marks omitted.) *Ford* v. *Ford*, supra, 68 Conn. App. 177. In *Ford*, we recognized that the interests present in a postjudgment proceeding to modify custody are not the same as those present during a trial for the dissolution of a marriage. Id., 179–81. We therefore concluded that the "scheme in *Ireland*, and the additional [factors under *Tropea* v.

[9] General Statutes § 46b-56d was enacted in Public Acts 2006, No. 06-168, after our decision in *Ford*. Section 46b-56d (a) provides: "In any proceeding before the Superior Court *arising after the entry of a judgment awarding custody of a minor child* and involving the relocation of either parent with the child, where such relocation would have a significant impact on an existing parenting plan, the relocating parent shall bear the burden of proving, by a preponderance of the evidence, that (1) the relocation is for a legitimate purpose, (2) the proposed location is reasonable in light of such purpose, and (3) the relocation is in the best interests of the child." (Emphasis added.) By its terms, § 46b-56d *is* limited to proceedings following a judgment awarding custody of a child and does not apply to the present case.

*Tropea*, 87 N.Y.2d 727, 665 N.E.2d 145, 642 N.Y.S.2d 575 (1996)] [did] not pertain to relocation issues that arise at the initial judgment for the dissolution of marriage. Rather . . . *Ireland* is limited to postjudgment relocation cases. . . . [B]ecause the *Ireland* court did not expand its holding to affect all relocation matters, relocation issues that arise at the initial judgment for the dissolution of marriage continue to be governed by the standard of the best interest of the child as set forth in § 46b-56. While the *Ireland* factors[10] may be considered as 'best interest factors' and give guidance to the trial court, they are not mandatory or exclusive in the judgment context."[11] *Ford* v. *Ford*, supra, 184.

Section 46b-56 (c) directs the court, when making any order regarding the custody, care, education, visitation and support of children, to "consider the best interests of the child, and in doing so [the court] may consider, but shall not be limited to, one or more of [sixteen enumerated] factors . . . . The court is not required to assign any weight to any of the factors that it considers."[12]

---

[10] Although General Statutes § 46b-56d (a) removed the burden shifting scheme set out in *Ireland*, the *Ireland* factors were essentially codified by § 46b-56d (b).

[11] The enactment of General Statutes § 46b-56d clearly changed the analysis and the burden allocation in postjudgment relocation cases, but there is no indication that the legislature intended it to apply to relocation matters resolved at the time of the initial judgment for the dissolution of a marriage.

[12] The factors set forth in § 46b-56 (c) are: "(1) The temperament and developmental needs of the child; (2) the capacity and the disposition of the parents to understand and meet the needs of the child; (3) any relevant and material information obtained from the child, including the informed preferences of the child; (4) the wishes of the child's parents as to custody; (5) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (6) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (7) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (8) the ability of each parent to be actively involved in the life of the child; (9) the child's adjustment to his or her home, school and community environ-

The defendant claims that the court improperly permitted the plaintiff to relocate to Virginia with the parties' minor son. The defendant argues that "there was a pronounced lack of evidence that the best interests of the child would be served or advanced by having to move to Virginia." We disagree.

In support of his argument, the defendant refers, inter alia, to (1) the court's finding that the child has close ties with both parents, (2) the deposition testimony of the plaintiff's direct supervisor that she would not lose salary if she did not relocate,[13] (3) evidence that the

ments; (10) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (11) the stability of the child's existing or proposed residences, or both; (12) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (13) the child's cultural background; (14) the effect on the child of the actions of an abuser, if any domestic violence has occurred between the parents or between a parent and another individual or the child; (15) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (16) whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b."

[13] The deposition testimony of the plaintiff's supervisor made clear that the plaintiff received a base salary and commissions. Her employer also testified that the plaintiff received a raise to her salary on the basis of the high cost of living in Connecticut. The defendant argues that "[t]he court had no basis for determining that the cost of living would be less in Virginia other than the unsupported impressions held by [the] plaintiff. In fact, the testimony of the plaintiff's supervisor . . . suggests the opposite, namely, that from a cost-of-living standpoint, the move to Virginia would adversely affect the plaintiff economically." The defendant misconstrues the import of the testimony on which he relies; the supervisor's testimony indicated that Lexmark believed that the cost of living in Connecticut to be so high as to warrant an increase in salary.

Although it is clear that the plaintiff's forfeiture of that increase, by moving to Virginia, would cause a decrease in her base salary, the defendant has not provided us with sufficient references to the evidence from which we could evaluate the court's determination of how the plaintiff's overall compensation related to the plaintiff's overall cost of living. In addition, the court may reasonably have determined that the plaintiff's increased access

plaintiff had a successful career while living in Connecticut, (4) the court's statement that the defendant did not pay child support pendente lite or contribute to medical expenses,[14] (5) the court's finding that the defendant had never witnessed one of the child's seizures, (6) the court's finding that if the minor child continued to live in Connecticut, he would be a pawn in the defendant's power struggle with the plaintiff for a considerable period of time, (7) the court's finding that the defendant was untrustworthy and unreliable in his financial dealings with the plaintiff and the court's statement that it had no evidence that the defendant's behavior would change before the child reached adulthood, (8) the court's finding that the defendant had the means and opportunity to conduct visitation in Virginia and (9) the court's failure to do an in-depth analysis of each of the defendant's reasons for opposing the relocation.[15]

to her customers would result in increased compensation from commissions and offset any loss of base salary.

[14] The defendant argues that the court "apparently condemned" him for not making support payments that were never requested or ordered. The defendant's references to the court's decision, however, lead only to its finding that Cummings-Texeira "noted that [the defendant] did not pay child support pendente lite" and that Cummings-Texeira recommended relocation in part because "although [the defendant was] not in violation of any court order for child support . . . [he] did not voluntarily pay any child support, and the [plaintiff] was solely responsible for [the child's] medical expenses which were approximately $18,000." We fail to see how this recitation of testimony constitutes the apparent condemnation that the defendant perceives.

[15] The defendant argues in his brief: "The court's bias against [the] defendant, or in favor of [the] plaintiff, is evident throughout the court's memorandum and was similarly apparent in the manner in which the proceedings were conducted. . . . The court clearly was not focused on the best interests of the child, but rather on criticizing the defendant." It is clear from the defendant's argument that his claim stems primarily from his conclusion that the court's findings of fact and orders were adverse to him. The defendant did not file a motion for a recusal, disqualification or mistrial on the ground of bias.

It is well settled that "[a]dverse rulings do not themselves constitute evidence of bias. *State* v. *Fullwood*, 194 Conn. 573, 582, 484 A.2d 435 (1984). Obviously, if a ruling against a party could be used as an indicia of bias, at least half of the time, every court would be guilty of being biased against

The defendant essentially requests that we reassess and reweigh the evidence in his favor. We decline to do so. "Once again, this court is compelled to state, what has become a tired refrain, we do not retry the facts or evaluate the credibility of witnesses. *Bowman* v. *Williams*, 5 Conn. App. 235, 238, 497 A.2d 1015 (1985), appeal dismissed, 201 Conn. 366, 516 A.2d 1351 (1986), and cases cited therein." (Internal quotation marks omitted.) *Wilcox* v. *Ferraina*, 100 Conn. App. 541, 555, 920 A.2d 316 (2007). There is ample evidence in the record[16] to support the court's findings of fact, and we cannot say that the weight given to those facts amounted to an abuse of the court's discretion.

## II

Second, the defendant claims that the court improperly ordered him to pay a penalty for missed visitation.[17]

---

one of two parties. Moreover, the fact that a trial court rules adversely to a litigant, even if some of these rulings were determined on appeal to have been erroneous, [still] does not demonstrate personal bias. *Bieluch* v. *Bieluch*, 199 Conn. 550, 553, 509 A.2d 8 (1986)." (Internal quotation marks omitted.) *Peatie* v. *Wal-Mart Stores, Inc.*, 112 Conn. App. 8, 26, 961 A.2d 1016 (2009). We again remind attorneys that "[a] charge of . . . bias against a trial judge in the execution of his or her duties is a most grave accusation. It strikes at the very heart of the judiciary as a neutral and fair arbiter of disputes for our citizenry. Such an attack travels far beyond merely advocating that a trial judge ruled incorrectly as a matter of law or as to a finding of fact, as is the procedure in appellate practice. A judge's personal integrity and ability to serve are thrown into question, placing a stain on the court that cannot easily be erased. Attorneys should be free to challenge, in appropriate legal proceedings, a court's perceived partiality without the court misconstruing such a challenge as an assault on the integrity of the court. Such challenges should, however, be made only when substantiated by the trial record." (Internal quotation marks omitted.) Id., 26–27 n.10. After a review of the record, we can find nothing to substantiate the defendant's claim or lead us to question the court's impartiality in this case.

[16] We note that in her brief, the plaintiff referenced deposition testimony that was not in evidence. In his reply brief, the defendant contested the plaintiff's discussion of that testimony and included additional analysis of the testimony. Because it was never made part of the record, we have not included that testimony in our review of the evidence.

[17] Neither party has provided any authority that permits or prohibits the court's prospective reduction, pro rata, of child support payments tied to actual attendance at visitation. We do not today endorse such orders but find the current record and argument insufficient to require the reversal of the court's judgment.

We decline to review this claim because the defendant has failed to present his claim adequately for our review.

The court entered the following order with regard to child support: "If [the defendant] exercises his visitation as ordered by the court . . . the court is not ordering the [defendant] to pay weekly child support. The court notes that under the Connecticut child support guidelines, his child support would be $161 per week, and he would contribute 31 [percent] toward the child's medical expenses and work-related day care expenses. The court is not making a weekly child support award at this time due to the extraordinary expenses the [defendant] will incur in exercising his visitation rights long distance. If, however, the [defendant] fails to exercise his visitation . . . he shall pay child support in the amount of $346 for each missed visit (in essence, two weeks of child support)."

"The duty to provide this court with a record adequate for review rests with the appellant. . . . It is incumbent upon the appellant to take the necessary steps to sustain its burden of providing an adequate record for appellate review. Practice Book § 4061 [now § 60-5] . . . . It is not the function of this court to find facts. . . . Our role is . . . to review claims based on a complete factual record developed by a trial court." (Internal quotation marks omitted.) *State* v. *Cotto*, 111 Conn. App. 818, 821, 960 A.2d 1113 (2008).

Additionally, we note that General Statutes § 46b-86 (a) may provide a more appropriate vehicle in such cases, by allowing a motion for modification of child support "upon a showing of a substantial change in the circumstances of either party or upon a showing that the final order for child support substantially deviates from the child support guidelines established pursuant to section 46b-215a, unless there was a specific finding on the record that the application of the guidelines would be inequitable or inappropriate." A decision based upon such a motion has the benefit of a record of the parties' actions and the reasons for those actions, a record which is necessarily lacking in a prospective order. See, e.g., *Gaffey* v. *Gaffey*, 91 Conn. App. 801, 882 A.2d 715, cert. denied, 276 Conn. 932, 890 A.2d 572 (2005).

The defendant again relies on his argument that the court excused him from his support obligation of approximately $8000 each year only to cause him to pay $25,000 for visitation and $346 for each missed visit. The defendant has not provided any citations to the record that would support his factual claims. Without the necessary factual findings of the court, our analysis of the defendant's claim would be mere speculation.

Additionally, the problems presented by the inadequate record are exacerbated by the fact that the defendant's brief was so scant. The defendant has provided no legal authority for his claims, save for references to cases that he argues state that (1) child support payments may not be eliminated as punishment for interference with visitations, (2) alimony may not be contingent on sobriety, (3) support payments may not be conditioned on the right of visitation and (4) visitation may not be conditioned on the payment of child support. The defendant then simply declares that the court's order imposes a penalty and is improper. "[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failing to brief the issue properly. . . . Where the parties cite no law and provide no analysis of their claims, we do not review such claims." (Internal quotation marks omitted.) *Rozbicki* v. *Statewide Grievance Committee*, 111 Conn. App. 239, 240 n.2, 958 A.2d 812 (2008), 290 Conn. 908, 962 A.2d 544 (2009). Accordingly, we decline to review this claim.

### III

The defendant's third claim is that the court improperly awarded sole legal and physical custody to the plaintiff. The defendant argues that the court awarded sole custody to the plaintiff because it believed neither

party had requested joint custody. The defendant, however, has provided no factual basis for his claim.[18] Accordingly, we cannot conclude that the court's award of sole legal and physical custody to the plaintiff was improper.[19]

## IV

Finally, the defendant claims that the court improperly ordered him to maintain life insurance after the child attains the age of majority. The defendant argues that the court exceeded its jurisdiction by ordering the maintenance of life insurance "to protect the future financial support of the minor child if either parent dies prior to their son reaching the age of majority *or completing his postsecondary education.*" (Emphasis in original.) The defendant argues that the court's order is improper because it "simply suggested that the life insurance should be continued until the child complete[s] college, regardless of whether any educational support order [is] ever entered . . . ."

The defendant's claim implicates General Statutes §§ 46b-56c, 46b-82 and 46b-84. "Construction of a statute calls for the plenary standard of review. . . . In fashioning its financial orders [however] the court has broad discretion, and [j]udicial review of a trial court's exercise of [this] broad discretion . . . is limited to the questions of whether the . . . court correctly applied the law and could reasonably have concluded as it did.

[18] The defendant cites to a page of the court's memorandum of decision as support for his claim, but we can observe only that it contains the following statement: "[The guardian ad litem] recommended that the court award sole custody to the plaintiff wife. He made this recommendation because *prior to trial* neither party had requested joint custody." (Emphasis added.) We note that it is clear from the record that neither party requested joint custody until the defendant amended his cross complaint *during trial.* We cannot construe the court's statement as anything other than a recitation of the facts on which the guardian ad litem based his recommendation.

[19] The defendant has provided no other argument in support of his claim that the court's custody order was improper.

. . . In making those determinations, we allow every reasonable presumption . . . in favor of the correctness of [the trial court's] action. . . . That standard of review reflects the sound policy that the trial court has the unique opportunity to view the parties and their testimony, and is therefore in the best position to assess all of the circumstances surrounding a dissolution action, including such factors as the demeanor and the attitude of the parties." (Citation omitted; internal quotation marks omitted.) *Crews* v. *Crews*, 107 Conn. App. 279, 300, 945 A.2d 502, cert. granted on other grounds, 288 Conn. 901, 952 A.2d 809 (2008).

The defendant's claim is governed by our holding in *Crews*. In that case, we concluded that when the court retains jurisdiction over educational support orders, the court may provide for assurance of that support with life insurance. "Because the statutory scheme anticipates that a dissolution may occur in advance of the time postsecondary educational decisions appropriately can be made, it provides a mechanism for the court to retain jurisdiction for the purpose of ordering educational support for adult children." Id., 302.

"[D]ecisions about postsecondary education usually occur at about the time a person becomes eighteen years of age. The defendant does not argue that the court abused its discretion by requiring him to maintain life insurance for the benefit of his children while they are minors. The court did not abuse its discretion, therefore, by issuing a financial order that would secure any educational support order that might be entered in the future, at about the time the children become eighteen and are making decisions about their educational futures. It is often said that common sense is not left at the courthouse door. . . . As a matter of judicial economy, it would not be practical to require the defendant to maintain life insurance for the benefit of a minor child, terminate it when the child becomes eighteen

and reinstitute it some months later when the adult child matriculates at a postsecondary educational institution as the beneficiary of an educational support order. See General Statutes § 46b-56c (g) (3)." (Citation omitted.) *Crews* v. *Crews,* supra, 107 Conn. App. 304.

In *Crews,* we noted that the court's life insurance order was ambiguous because it might improperly have required the defendant "to provide insurance for the benefit of one of his children who reaches the age of majority and is not the beneficiary of an educational support order." Id., 307–308. In the present case, however, we find that the court's order of postmajority life insurance is clearly tied to a future educational support order. Although we agree that it would be better if the court explicitly had stated that the life insurance must be permitted to lapse if such an educational support order is not entered, we can find no other intent on the part of the court. Accordingly, we conclude that the court's life insurance order was proper.

The judgment is affirmed.

In this opinion the other judges concurred.