******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# R. D. *v.* G. D.
# (AC 47576)

Alvord, Clark and Seeley, Js.

*Syllabus*

The defendant appealed from the trial court's judgment dissolving his marriage to the plaintiff and granting certain other relief. He claimed, inter alia, that the court erred in awarding the plaintiff sole physical and legal custody of the parties' minor children without granting him visitation. *Held*:

The trial court did not abuse its discretion in awarding the plaintiff sole physical and legal custody of the parties' children without granting the defendant visitation, as the court expressly determined that a grant of visitation to the defendant would not be in the children's best interests and made detailed findings concerning the defendant's unfitness as a parent and the physical and psychological danger he posed to the children.

The defendant's claim that the trial court improperly awarded the plaintiff alimony on the basis of the defendants' postseparation increase in income was foreclosed by this court's decision in *Panganiban* v. *Panganiban* (54 Conn. App. 634), and, even if the defendant were correct that it was improper for the trial court to rely on a postseparation, but predissolution, increase in income when entering an initial alimony award, the record did not support his claim that the court's alimony award was based solely on his postseparation increase in income because the court properly considered the factors required by the statute (§ 46b-82) governing alimony awards.

The trial court did not err in awarding pendente lite alimony to the plaintiff at the time of dissolution, as the applicable statute (§ 46b-83 (a)) expressly permitted the court to award pendente lite alimony from the date of the plaintiff's initial application for alimony, and this court's decision in *Hallock* v. *Hallock* (228 Conn. App. 81) established that the trial court had authority to decide the pendente lite alimony motion at the time of the dissolution judgment.

The trial court did not err in determining that mandatory distributions that the plaintiff received from an inherited individual retirement account (IRA) should not be considered when calculating her income for child support purposes, as an inherited IRA does not function as a retirement account, but is more akin to a savings account from which the beneficiary can withdraw funds at her discretion, and withdrawals from an inherited IRA do not qualify as income within the plain meaning of that term.

The trial court did not abuse its discretion in ordering the defendant to maintain a $700,000 life insurance policy as security for his child support obligations, as the defendant did not provide any analysis or point to any evidence in the record to support his claim that the life insurance order was excessive when certain elements of his child support obligations were

considered and in light of the strong presumption of correctness that this court affords a trial court's financial orders.

This court declined to review the defendant's claim that the trial court erred in ordering him to pay $20,000 in attorney's fees to the plaintiff, as the defendant failed to provide this court with a complete transcript of the proceedings and the defendant failed to articulate his objection to the fee award before the trial court.

Argued November 17, 2025—officially released February 17, 2026

### Procedural History

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Middlesex and tried to the court, *Albis, J.*; judgment dissolving the marriage and granting certain other relief, from which the defendant appealed to this court. *Affirmed*.

*Brandon B. Fontaine*, with whom, on the brief, was *Meaghan E. Collins*, for the appellant (defendant).

*Maria A. Dornfried*, for the appellee (plaintiff).

### Opinion

CLARK, J. The defendant, G. D., appeals from the judgment of the trial court dissolving his marriage to the plaintiff, R. D. On appeal, the defendant claims that the court erred in (1) awarding the plaintiff sole physical and legal custody of the parties' minor children without granting the defendant visitation, (2) ordering the defendant to pay periodic and pendente lite alimony to the plaintiff, (3) calculating the plaintiff's income for purposes of determining the defendant's child support obligations, (4) ordering the defendant to secure and maintain a $700,000 life insurance policy for the benefit of the children as security for his child support obligations, and (5) ordering the defendant to pay $20,000 in attorney's fees to the plaintiff. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. The parties were married on September

22, 2006, and have two children born of the marriage: a daughter, A, born in May, 2008, and a son, N, born in June, 2012. The parties jointly own a home in Weston (Weston residence), in which they resided at the time of their separation. The parties also jointly own an apartment in New York (New York apartment).[1]

The plaintiff has a bachelor's degree from the University of Vermont and a master's degree from Middlebury Institute of International Studies. Since February, 2021, the plaintiff has worked as an independent contractor, earning $35 per hour providing customer service and billing services. The defendant has a master's degree from Central European University and doctorate degrees from St. Petersburg State University and Stanford University. The defendant has worked in the field of advertising and marketing since 2006. He was unemployed from September, 2018, through January, 2022. Since January 31, 2022, the defendant has been employed as a senior vice president at Havas Health, Inc., where he earns a salary of $5000 per week before taxes and other deductions.

The defendant was verbally and emotionally abusive toward the plaintiff and both children and physically abused the plaintiff and A. In its memorandum of decision, the court recounted two incidents of the defendant's abuse in detail. The first incident occurred on Cape Cod on or around July 31, 2019, while the defendant was driving the family back to a cottage in Dennis Port, Massachusetts (Cape Cod incident). The court found that, "[o]n the trip home, the [plaintiff] grabbed and turned the steering wheel because she perceived that the [defendant] was swerving the car toward oncoming traffic from the other direction. The [defendant] responded by hitting and/or

---

[1] In addition to their jointly owned properties, the plaintiff owns a 5 percent interest in a family cottage in Dennis Port, Massachusetts, and the defendant owns an apartment and one unit in a duplex, both located in Russia. As part of the judgment of dissolution, the court awarded each party their separate ownership interests in their respective properties, and neither party has raised any claims with respect to those assets. Accordingly, we will not address those assets further in this opinion.

pushing the [plaintiff's] head away, which prompted the [plaintiff] to strike back and begin kicking the [defendant] as she lay on her back against the front passenger door. Each party inflicted injuries upon the other as the struggle continued intermittently for the remainder of the drive, the [defendant] periodically slowing down or pulling over to focus on hitting the [plaintiff]. When the parties arrived at their cottage, the [plaintiff] rolled out of the passenger door onto the ground. The [defendant] exited the vehicle, approached the [plaintiff] as she lay on the ground, clasped his hands together and brought them down forcefully upon her head. The impact of the blow caused damage to multiple teeth of the [plaintiff]." The court rejected the defendant's argument that he had acted in self-defense, noting that his claim was "undercut by the fact that he struck his final injurious blow to the [plaintiff] after the car had stopped and she had rolled out of the car and lay defenseless on the ground, when any danger of a car accident or further injury to the [defendant] had passed."[2] The Cape Cod incident resulted in an investigation by the Department of Children and Families, which substantiated allegations of physical and emotional neglect by the defendant as to both children.

The second incident occurred at the Weston residence on January 25, 2021, after A refused to practice piano in accordance with the defendant's demands (piano incident). Unbeknownst to the defendant, the plaintiff recorded the incident on her phone, and the recordings were admitted as exhibits during trial. The court found that "[t]he video of the piano incident is very disturbing. The [defendant] conducts a tirade that continues for at least fifteen to twenty minutes after the [plaintiff] begins filming. He yells loudly throughout, almost nonstop, directing most of his invective at [A] but also addressing, at times, the [plaintiff] and [N]. He calls [A] a 'stupid idiot,' 'fucking dumb,' and 'stupid fucking idiot.' Speaking more generally to and about both children, he

---

[2] The defendant was arrested as a result of the incident, but the charges were later dismissed because the plaintiff declined to cooperate as a witness.

screams such things as, 'I hate you kids' and 'fucking losers.' He criticizes them for wanting to do activities that he says are favored by lazy American children but which he considers useless, such as reading Harry Potter books. He calls the plaintiff a 'fucking American loser.'[3] He says to the family, 'You're all pathetic losers.'

"The abuse by the defendant during the piano incident is not only verbal. The defendant concedes during the filmed portion of the incident that he had struck [A] with a shoe moments earlier. The video, and the plaintiff's credible testimony, show that he struck [A] again and that he spit on her. The credible testimony of the plaintiff, consistent with the video, also shows that the defendant grabbed [A] by the neck as she sat on the piano bench and repeatedly slammed her head down on the keyboard." (Footnote added; footnotes omitted.) The defendant was arrested as a result of the piano incident and is subject to a criminal protective order prohibiting him from having any contact with the plaintiff or the children, except by written communication.

Within days after the piano incident, the plaintiff left the marital home in Weston and moved with the children to an apartment in Old Saybrook. The plaintiff commenced this action on February 3, 2021. The complaint alleged that the marriage had broken down irretrievably and requested, inter alia, sole legal and physical custody of A and N, as well as child support, alimony, and an equitable distribution of the marital assets.

In addition to the dissolution action underlying this appeal, the plaintiff also filed, in a separate action, an ex parte application for a restraining order, alleging that the defendant had engaged in repeated and escalating acts of physical and emotional abuse against the plaintiff and the children. On February 4, 2021, the court, *Albis, J.*, entered a temporary restraining order prohibiting the defendant from having any contact with the plaintiff

___

[3] The defendant was born in Russia and immigrated to the United States in 1997 to attend Stanford University.

and both children.[4] On February 25, 2021, the court, *Hon. Gerard I. Adelman*, judge trial referee, entered an order on the plaintiff's application granting the plaintiff temporary custody of the children and prohibiting the defendant from having any contact with the plaintiff and the children, but requiring the plaintiff to provide the defendant with a weekly update on the children's activities and permitting the defendant to write letters to the children.

On February 16, 2021, the plaintiff filed motions for child support and alimony pendente lite. As of February 9, 2022, the court had not ruled on the plaintiff's motions. On that date, the plaintiff filed a renewed motion for child support pendente lite. On March 29, 2022, the parties filed, and the court adopted as an order of the court, an agreement requiring, inter alia, the defendant to pay child support pendente lite in the amount of $535 per week. The agreement did not address the plaintiff's request for alimony, and, on October 28, 2022, the plaintiff filed a renewed motion for alimony pendente lite. As of the commencement of trial, the court had not entered any orders with respect to the plaintiff's motions for alimony pendente lite.

On June 28, 2021, with the agreement of the parties, the court appointed Michael Perzin as guardian ad litem for the children. On December 21, 2021, pursuant to

---

[4] The dissolution complaint and the restraining order application were both filed in the judicial district of Middlesex. On February 5, 2021, after the court already had granted the plaintiff's ex parte application for a restraining order, the defendant filed a competing ex parte application for a restraining order in the judicial district of Stamford-Norwalk. The defendant's application was initially granted on an ex parte basis, but, after being notified that Judge Albis had already entered an ex parte restraining order in favor of the plaintiff, the court, *McLaughlin, J.*, vacated the ex parte order and transferred the matter to the judicial district of Middlesex. We take judicial notice of the defendant's application and the subsequent orders pertaining to that application. See *State* v. *Santiago*, 142 Conn. App. 582, 592 n.12, 64 A.3d 832 ("[i]t is well established that this court can take judicial notice of facts contained in the files of the Superior Court" (internal quotation marks omitted)), cert. denied, 309 Conn. 911, 69 A.3d 307 (2013).

the agreement of the parties, the court appointed Stephen Humphrey, a forensic psychologist, to conduct a psychological evaluation of the parties and the children for the purpose of "assess[ing] the parenting abilities of each party and mak[ing] recommendations concerning what custody and access orders would be in the children's best interests."

The case was tried to the court, *Albis, J.*, over the course of eleven nonconsecutive days between February 6 and December 4, 2023.[5] On April 3, 2024, the court issued a memorandum of decision dissolving the parties' marriage. The court determined that the defendant was significantly more responsible than the plaintiff for the breakdown of the parties' marriage, finding that his abuse of the plaintiff and the children "directly and substantially contributed to the breakdown of the marriage and the deterioration of his relationship with the children . . . ." The court awarded the plaintiff sole legal and physical custody of the children and declined to grant the defendant visitation with either child. The court ordered that the defendant may send two letters and one gift per week to N but ordered that the defendant had no right of contact with A. The court further ordered the defendant to engage in psychotherapy focused on helping him "understand the impact of his words and behavior on the children and to deal with his anger appropriately." The court ordered that, when the defendant has completed a minimum of twenty sessions of such therapy, he may file a motion for modification seeking visitation. The court also ordered that the defendant shall have the right to access the children's academic and health records, with certain specified limitations, and ordered the plaintiff to provide the defendant with a monthly written report of the children's activities.

The court found the presumptive child support payable by the defendant to be $569 per week and ordered the

---

[5] As explained subsequently in this opinion; see footnote 15 of this opinion; the defendant provided us with a transcript of only eight of the eleven trial days.

defendant to pay that amount to the plaintiff by wage withholding. The court further ordered the defendant to maintain medical and dental insurance coverage for the children at his sole expense, and ordered the defendant to pay 68 percent, and the plaintiff 32 percent, of the children's unreimbursed medical and childcare expenses. The court also ordered that, "[t]o the extent that it is available at a reasonable cost, the defendant shall obtain and maintain a policy of life insurance on his life with a death benefit of at least $700,000 for so long as there remains in effect a court-ordered obligation for child support or postmajority educational expenses or the court continues to have jurisdiction to enter such an order."

With respect to alimony, the court ordered the defendant to pay the plaintiff $650 per week for seven years or until the death of either party or the plaintiff's remarriage, whichever occurs first. The court also entered an order on the plaintiff's motions for alimony pendente lite requiring the defendant to pay the plaintiff $650 per week from January 31, 2022, through the date of judgment, resulting in an arrearage of $73,450.[6]

The court also ordered the parties to sell the Weston residence and to split the proceeds of such sale, 60 percent to the plaintiff and 40 percent to the defendant, and to sell the New York apartment and to split the proceeds of such sale equally. The court further ordered the defendant to transfer from his retirement accounts the amount necessary to equalize the value of the parties' retirement assets. Finally, the court awarded the plaintiff $20,000 in attorney's fees. This appeal followed. Additional facts will be set forth as necessary.

---

[6] The court also ordered that (1) in the event that the defendant has not paid the alimony arrearage at the time of the sale of the Weston residence or the New York apartment, the defendant shall utilize his share of the proceeds from the sale of those properties to satisfy the arrearage, and (2) the defendant shall obtain a life insurance policy for the benefit of the plaintiff with a minimum death benefit of $300,000 and maintain such policy for as long as he is obligated to pay alimony. The defendant does not challenge these aspects of the court's alimony award.

## I

The defendant first claims that the court erred in awarding the plaintiff sole physical and legal custody of the parties' children without granting him visitation. Specifically, he claims that the court failed to consider "the rights and responsibilities of both parents" and did not "provide the [children] with the active and consistent involvement of both parents commensurate with their abilities and interests," as required by General Statutes § 46b-56 (b).[7] We disagree.

The following legal principles and standard of review are relevant to the defendant's claim. "Orders regarding the custody and care of minor children . . . are governed by . . . § 46b-56, which grants the court broad discretion in crafting such orders. . . . [Section] 46b-56 (a) provides in relevant part: In any controversy before the Superior Court as to the custody or care of minor children . . . the court may make . . . any proper order regarding the custody, care, education, visitation and support of the children if it has jurisdiction . . . . Subject to the provisions of [General Statutes §] 46b-56a, the court may assign parental responsibility for raising the child to the parents jointly, or may award custody to either parent or to a third party, according to its best judgment upon the facts of the case and subject to such conditions and

[7] In connection with his argument that the court failed to consider the rights and responsibilities of both parents, the defendant asserts that "the constitutional rights surrounding parents and children are among the most significantly protected by our courts" and argues that the court's order "strays from honoring . . . [his] constitutional parenting rights . . . ." The defendant, however, did not raise any constitutional challenge before the trial court, does not argue in his principal appellate brief or his reply brief that the court's order violates his constitutional rights, and has not presented any analysis that would support such a claim. Rather, he argues that, "[u]nder the law and circumstances, the underlying judgment does not fulfill the multiple considerations of § 46b-56 (b), nor does it embody the ultimate best interests of the children." Accordingly, we construe the defendant's claim to be that the court abused its discretion in declining to award him any visitation. To the extent that the defendant intended to raise a constitutional claim, we decline to review it on the ground that it is inadequately briefed. See *Cardona* v. *Padilla*, 230 Conn. App. 534, 549 n.13, 330 A.3d 912 (2025).

limitations as it deems equitable. . . . (b) In making . . . any order as provided in subsection (a) of this section, the rights and responsibilities of both parents shall be considered and the court shall enter orders accordingly that serve the best interests of the child and provide the child with the active and consistent involvement of both parents commensurate with their abilities and interests. . . . [Section] 46b-56 (c) directs the court, when making any order regarding the custody, care, education, visitation and support of children, to consider the best interests of the child, and in doing so [the court] may consider, but shall not be limited to, one or more of [seventeen enumerated] factors[8] . . . . The court is not

[8] " 'In determining the best interests of the child, the court looks to the factors enumerated in § 46b-56 (c): "(1) The physical and emotional safety of the child; (2) the temperament and developmental needs of the child; (3) the capacity and the disposition of the parents to understand and meet the needs of the child; (4) any relevant and material information obtained from the child, including the informed preferences of the child; (5) the wishes of the child's parents as to custody; (6) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (7) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (8) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (9) the ability of each parent to be actively involved in the life of the child; (10) the child's adjustment to his or her home, school and community environments; (11) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (12) the stability of the child's existing or proposed residences, or both; (13) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (14) the child's cultural background; (15) the effect on the child of the actions of an abuser, if any domestic violence, as defined in [General Statutes §] 46b-1, has occurred between the parents or between a parent and another individual or the child; (16) whether the child or a sibling of the child has been abused or neglected, as defined respectively in [General Statutes §] 46b-120; and (17) whether the party satisfactorily completed

required to assign any weight to any of the factors that it considers." (Footnote in original; internal quotation marks omitted.) *Cardona* v. *Padilla*, 230 Conn. App. 534, 544–45, 330 A.3d 912 (2025).

"In reaching a decision as to what is in the best interests of a child, the court is vested with broad discretion and its ruling will be reversed only upon a showing that some legal principle or right has been violated or that the discretion has been abused. . . . As our Supreme Court recently reiterated, [t]he authority to exercise the judicial discretion [authorized by § 46b-56] . . . is not conferred [on] [the state's appellate courts], but [on] the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court. . . . A mere difference of opinion or judgment cannot justify our intervention. Nothing short of a conviction that the action of the trial court is one [that] discloses a clear abuse of discretion can warrant our interference." (Internal quotation marks omitted.) *N. R.* v. *M. P.*, 227 Conn. App. 698, 716, 323 A.3d 1142 (2024).

It is well established that a parent's right to visitation is subordinate to the best interest of the child. See *C. D.* v. *C. D.*, 218 Conn. App. 818, 836, 293 A.3d 86 (2023) ("in matters involving child custody . . . while the rights, wishes and desires of the parents must be considered it is nevertheless the ultimate welfare of the child [that] must control the decision of the court" (internal quotation marks omitted)). "A parent's privilege of visitation of children whose custody has been awarded to the other parent in a divorce action . . . is not an absolute right but one which is dependent on what is for the best interests of the children even though such visitation rights may be restricted or effectively terminated." *Raymond* v. *Raymond*, 165 Conn. 735, 741, 345 A.2d 48 (1974). Thus, when a court determines that visitation by the noncustodial parent would be detrimental to the child's best interest, it is within the court's discretion to decline

participation in a parenting education program established pursuant to [General Statutes §] 46b-69b." General Statutes § 46b-56 (c).' " *Cardona* v. *Padilla*, 230 Conn. App. 534, 544 n.11, 330 A.3d 912 (2025).

to award visitation. See, e.*g.*, *El Idrissi* v. *El Idrissi*, 173 Conn. 295, 301, 377 A.2d 330 (1977) (court did not abuse its discretion in awarding mother sole custody and denying father any rights of visitation when court found that defendant previously threatened to harm and kidnap child, withheld necessary medical care from child, and had not seen child since he was less than two years old); *Ortega* v. *Bhola*, 88 Conn. App. 457, 458, 869 A.2d 1261 (2005) (court did not err in denying father visitation when father had not seen child in three years and had been incarcerated for most of child's life).

The defendant nevertheless argues that the court's factual findings do not support its decision not to award him visitation. In support of that contention, the defendant relies on our recent decision in *Cardona* v. *Padilla*, supra, 230 Conn. App. 534, in which we concluded that a trial court abused its discretion by ordering only limited visitation without making factual findings to support its conclusion that the limitations were in the child's best interest. The defendant argues that the court likewise abused its discretion in the present case because "the findings do not rise to the level of 'complete unfitness' that is spoken to in *Cardona* to avoid 'active and consistent involvement' in the children's lives."[9] We are not persuaded.[10]

In *Cardona*, the trial court awarded the parties joint physical and legal custody of their child but ordered that

---

[9] At one point in his principal appellate brief, the defendant characterizes his claim as one challenging the trial court's application of an allegedly improper legal standard and, therefore, argues that his claim raises a question of law subject to plenary review. In his analysis, however, the defendant does not point to any part of the court's decision indicating that the court failed to apply the standard set forth in § 46b-56 (b). Instead, the defendant's argument focuses on the question of whether the court's findings justified its decision not to award him visitation. Consistent with our precedent, we review the defendant's claim under the abuse of discretion standard of review. See, e.*g.*, *Cardona* v. *Padilla*, supra, 230 Conn. App. 550 (reviewing under abuse of discretion standard claim that court erred by granting only limited visitation without finding "that [the plaintiff] was unfit or that she presented a physical danger to the child").

[10] We note that, as discussed in footnotes 15 and 16 of this opinion, the defendant's failure to provide us with a complete transcript of the

the child would live with the father in Florida during the school year and spend only summers, one week in late December, and one long weekend around the Easter holiday with the mother in Connecticut. Id., 540–41. After the court issued an oral ruling detailing its custody and visitation orders, the mother asked the court to consider awarding her additional visitation time in Florida at her own expense. Id., 542–43. The court denied that request on the basis that the child needed stability and that frequent long-distance travel would not be in the child's best interest. Id., 543, 553 n.15.

On appeal, this court concluded that the trial court abused its discretion because its factual findings did not support the limited visitation time awarded to the mother. Id., 555. We explained that, although trial courts are vested with broad discretion in crafting custody and visitation orders, "the plain language of **[§ 46b-56 (b)]** conveys a legislative intent that orders regarding

proceedings precludes our review of any claims that would require us to assess whether the trial court's decision is supported by the evidence in the record. See *Krausman* v. *Liberty Mutual Ins. Co.*, 236 Conn. App. 109, 127, 347 A.3d 198 (2025) ("[I]n connection with a claim that requires this court to review the evidence presented at trial . . . we must consider the evidence as a whole, including evidence of a testimonial nature. In the absence of a complete transcript, we would have to resort to speculation to resolve [the appellant's challenge to the factual findings of the trial court]." (Internal quotation marks omitted.)). With respect to the court's custody and visitation orders, however, the defendant does not argue that the court's orders are not supported by the evidence. Rather, he argues that the court's findings do not justify its decision not to grant him visitation with the children in light of the requirement in § 46b-56 (b) that the court consider "the rights and responsibilities of both parents" and "enter orders accordingly that . . . provide the child with the active and consistent involvement of both parents commensurate with their abilities and interests." Specifically, in his principal appellate brief, he argues that "the findings do not rise to the level of 'complete unfitness' that is spoken to in *Cardona* to avoid 'active and consistent involvement' in the children's lives." Similarly, in his reply brief, he argues that "the trial court did not make any finding that the defendant was an unfit parent, and no finding suggests that he is 'completely unfit.'" Because this claim requires us to review the memorandum of decision to determine whether the findings support the court's decision not to grant the defendant visitation, the present record is adequate to review the defendant's claim.

custody and visitation provide the child with active and regular or steady involvement by both parents, when the circumstances permit." Id., 552. We concluded that the trial court abused its discretion in failing to award the mother additional visitation because "the very unbalanced visitation order is not supported by any underlying factual findings demonstrating why such a limited visitation schedule is warranted, such as a finding of complete unfitness." (Footnote omitted.) Id., 558–59. We reached that conclusion because "[t]he court's decision [was] devoid of any findings specifically related to the [mother's] fitness that would suggest that the court determined that it was in the child's best interest to limit the child's visitation with the [mother]," and the court had "specifically found that the [mother] was not 'unfit in any way' and that neither parent posed 'a physical danger to the child . . . .' " Id., 553. We further reasoned that the court's concerns about frequent long-distance travel "do not by themselves provide a basis for denying a child the active involvement [of a parent] in the child's life," especially in light of the fact that the mother specifically requested that the court award her additional visitation time in Florida at her own expense. Id., 555.

Unlike in *Cardona*, the trial court in the present case expressly determined that "[a] grant of visitation to the [defendant] at this time would not be in the children's best interests" and made detailed findings concerning the defendant's unfitness as a parent and the physical and psychological danger he posed to the children. The court found that the defendant's "angry outbursts . . . when he disapproved of his family's behavior . . . were common occurrences," that he "regularly yelled at the [plaintiff] and the children when any of them dared to disagree with him or failed to comply with his demands and expectations," and that he "spit at the [plaintiff] and [A] in anger." The court further found that the defendant's "acts of domestic violence . . . have had a severely harmful psychological impact on the children" and credited Humphrey's opinion that "the children were deteriorating psychologically because of the [defendant's]

abuse and neglect . . . ." (Internal quotation marks omitted.) The court also found that the children's physical and psychological well-being had improved since they moved away from the defendant, noting that they "feel safe and secure in their new home, in large part due to the absence of the psychological and emotional stress caused by their father's conduct toward them and the plaintiff."

The court also determined that, despite the passage of time and participation in individual therapy, the defendant "still lacks a basic understanding of the trauma he has inflicted on [the children]" and that he "continues to believe he has done nothing seriously wrong" and "views himself as the true victim." The court found that the defendant "is rarely, if ever, willing to take responsibility for his own mistakes or misconduct" and "blames his problems, poor decisions, or inappropriate conduct on other people or external forces," noting that he blames A for the piano incident and "considers [the plaintiff's] filming of [that] incident to be a more serious transgression than his own words and actions during it." The court found that, in light of the defendant's history of abuse and lack of insight as to the harm he caused the children, "the renewal of contact between the [defendant] and the children would likely result in the [defendant's] resumption of his abusive behavior" and would be detrimental to their temperament and developmental needs.

Finally, as the court noted, the defendant is subject to two criminal protective orders that prohibit him from having any contact with the children other than by written communication. During oral argument before this court, the defendant's counsel acknowledged that those protective orders do not currently have any expiration date and that the criminal charges against the defendant arising from the piano incident remain pending. Thus, even if the court had granted the defendant visitation, he still would not be able to have any in person or telephone

contact with his children because the criminal protective orders prohibit him from doing so.

The defendant's contention that the court abused its discretion because it "failed to take a [less] drastic approach, despite the opportunity to do so," is unavailing. He contends that, rather than requiring the defendant to file a motion for modification after he completed a set number of therapy sessions, the court should have ordered a "phased in plan" that would have allowed him to "[work] toward family therapy, or supervised visits, or supervised phone or video calls . . . ." In support of that contention, the defendant points to evidence that he claims demonstrates his commitment to therapy and argues that the court should not have "required the defendant to obtain twenty sessions of further therapy before having the ability to seek modification of the orders."

As we previously explained, the trial court is vested with broad discretion in crafting its custody and visitation orders, and, on appeal, "we allow every reasonable presumption in favor of the correctness of [the court's] action." (Internal quotation marks omitted.) *F. S.* v. *J. S.*, 223 Conn. App. 763, 785, 310 A.3d 961, cert. denied, 350 Conn. 903, 323 A.3d 344 (2024). Because "the trial court is in a clearly advantageous position to assess the personal factors significant to a domestic relations case, such as demeanor and attitude of the parties at the hearing"; (internal quotation marks omitted) *Hathaway* v. *Hathaway*, 60 Conn. App. 818, 819, 760 A.2d 1280 (2000); it is not our role to second-guess the court's exercise of its discretion or to "review the evidence to determine whether a conclusion different from the one reached could have been reached." (Internal quotation marks omitted.) Id. Thus, the mere fact that the defendant presented evidence that, if credited, could have supported providing the defendant with a "phased in" path to reunification is not sufficient to establish that the court abused its discretion.

Moreover, the court expressly considered—and rejected—the "phased in" approach that the defendant advocates for on appeal. Specifically, the court noted that it "might have ordered a phase in of additional contact by the [defendant], at least with [N], after the defendant had completed a certain amount of therapy" but concluded that such an order would not be in the children's best interests because the defendant's history did not give the court confidence that he would seriously engage with therapy. The court found that "[t]he defendant's past approach to mental health therapy indicates that he only remains engaged with providers who accept his view of his circumstances and agree with his thoughts on treatment"[11] and that "[i]t would not be in the children's interests to order an automatic advance to family therapy with the children, or to a higher level of visitation, after the defendant had engaged in the specified number of sessions with the therapist of his choice.[12] Rather, the interests of the children would be best served by having the court assess the progress of the defendant's therapy in connection with a future motion to modify visitation."[13]

[11] Regarding the defendant's choice of therapists, the trial court found that "Alex Shvartsman, who testified about his work with the defendant . . . accepts, and reiterates as his own conclusion, the [defendant's] claim that the piano incident was an isolated occasion, even though the evidence shows the contrary" and "relies unquestioningly upon the defendant's version of the history of [the] family. As a result, the focus of the therapy is not to help the defendant understand the effects of his conduct, deal with his anger appropriately, or modify his behavior. Instead, the focus is to help the defendant deal with the sadness and depression he feels due to the lack of contact with his children."

[12] As the court noted, pursuant to General Statutes § 46b-6a (a), "[i]n a family relations matter, as defined in section 46b-1, if a court orders that a parent undergo treatment from a qualified, licensed health care provider, the court shall permit the parent to select a qualified, licensed health care provider to provide such treatment."

[13] The defendant argues that, instead of requiring him to seek a modification, the court could have alleviated its concerns about whether he would participate in therapy in good faith by "allow[ing] the phase in orders to be paused if the plaintiff filed a motion alleging legitimate concerns that developed during the process." He further notes that "[t]he plaintiff also would always have the right to pursue emergency custody orders when appropriate . . . ." This argument ignores that the court made detailed findings concerning the defendant's failure

(Footnote added.) The court explained that it reached that conclusion because, at a hearing on a motion for modification, it would "have the opportunity to consider evidence about the defendant's progress in the areas of controlling his words and actions and understanding the impact of his conduct upon the children," as well as "evidence about the children's psychological and emotional readiness to commence or increase contact with their father . . . ."[14] It is evident from the memorandum of decision that the court thoughtfully considered a phased in approach to visitation and decided on the basis of the evidence that such approach was not appropriate in light of the defendant's history of abusive conduct and his refusal or inability to appreciate the significant harm that his conduct caused to the children. Accordingly, we conclude that the court did not err in awarding the plaintiff sole physical and legal custody of the parties' children without granting the defendant visitation.

to acknowledge responsibility for his conduct and to appreciate the harm he caused his children and rejected the defendant's claim that he demonstrated his "extensive dedication to therapy over the past several years." The court found that the defendant "does not accept the opinions or recommendations of any professional that do not comport with his perception of reality" and that his "extensive therapy to date has not caused [him] to genuinely reassess his own behavior or seriously consider its impact on the children." In light of the court's findings, we disagree with the defendant's contention that the court should have imposed upon the plaintiff the burden to monitor the defendant's progress and proactively return to court if she perceived that granting him visitation would be detrimental to the children. Rather, given the court's findings, it was well within the court's discretion not to grant the defendant visitation and to require him to seek visitation by way of a motion for modification.

[14]We note that the record indicates that the defendant filed such a motion for modification on June 24, 2024, in which he alleged that he had completed twenty therapy sessions in accordance with the court's memorandum of decision. On September 22, 2025, after a hearing, the court, *Price-Boreland, J.*, entered an order dismissing the defendant's motion. In the order, the court noted that the criminal protective order remains "in place with no current expiration date" and that "[t]he next scheduled date for a hearing on the [criminal] matter is February 16, 2027." The defendant appealed the dismissal of his motion for modification to this court, and that appeal remains pending.

## II

The defendant next claims that the court erred in ordering him to pay periodic and pendente lite alimony to the plaintiff. Specifically, the defendant claims that (1) the court improperly awarded the plaintiff alimony based on the defendant's postseparation increase in income, and (2) the court improperly awarded "retroactive" alimony pendente lite at the time of the dissolution judgment. We disagree with both claims.[15]

We first set forth the legal principles and standard of review applicable to a court's alimony award. "The

---

[15] The defendant also claims that the court abused its discretion in awarding both periodic alimony and alimony pendente lite because the record does not support that either award comports with an "accepted purpose" for which alimony may be awarded. The defendant, however, did not provide us with a complete transcript of the proceedings, thereby precluding our review of this claim.

Specifically, the record indicates that trial commenced on February 6, 2023. The transcript from that date indicates that the plaintiff's counsel commenced, but did not complete, her direct examination of the defendant. Before adjourning for the day, the court stated that it would "resume on the second day with continued direct examination of [the defendant] by [the plaintiff's counsel]." The record indicates that additional trial dates were held on March 20, 23 and 30, 2023, but the defendant did not provide us with a transcript of the proceedings from those dates. The next trial date for which the defendant provided a transcript was May 8, 2023. At the outset of the proceedings on that date, the court stated that "when we concluded [the defendant] was on the stand; he was being questioned by [the defendant's counsel]," to which the defendant's counsel replied, "Yes, Your Honor." Thus, the record indicates that there were three days of trial for which the defendant did not provide us with a transcript and that we do not have a complete transcript of the defendant's testimony. Without a complete transcript of the proceedings, we cannot assess the defendant's claim that the record does not support the court's alimony award. See *McGaffin* v. *Roberts*, 193 Conn. 393, 409, 479 A.2d 176 (1984) ("the validity of any claim that the trial court's decision is not supported by the evidence may be tested only by reference to the record together with the transcripts and exhibits filed in the case"), cert. denied, 470 U.S. 1050, 105 S. Ct. 1747, 84 L. Ed. 2d 813 (1985); see, e.g., *Calo-Turner* v. *Turner*, 83 Conn. App. 53, 55–56, 847 A.2d 1085 (2004) (defendant's failure to provide complete transcript precluded review of claim that court improperly found parties equally at fault for breakdown of marriage because that claim "required [this court] to determine whether there was a basis from

decision of whether to award alimony to a party rests in the discretion of the trial court after consideration of the statutory factors set forth in [General Statutes] § 46b-82. . . . That section requires the trial court to consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to [General Statutes §] 46b-81 [concerning the division of marital property] . . . . In awarding alimony, [t]he court must consider all of these criteria. . . . It need not, however, make explicit reference to the statutory criteria that it considered in making its decision or make express findings as to each statutory factor. . . . The trial court may place varying degrees of importance on each criterion according to the factual circumstances of each case." (Internal quotation marks omitted.) *Emrich* v. *Emrich*, 233 Conn. App. 324, 328–29, 340 A.3d 517 (2025).

"We review financial awards in dissolution actions under an abuse of discretion standard. . . . In order to conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did. . . . In determining whether the trial court's broad legal discretion is abused, great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness. . . . We apply that standard of review because it reflects the sound policy that the trial court has the unique opportunity to view the parties and their testimony, and is therefore in the best position to assess all of the circumstances surrounding a dissolution action, including such factors as the demeanor and the attitude of the parties." (Internal quotation marks

which the trial court could have found that the parties were equally at fault for the breakdown of the marriage").

omitted.) *Hallock* v. *Hallock*, 228 Conn. App. 81, 85–86, 324 A.3d 193 (2024).

## A

The defendant claims that the court erred in relying on his postseparation income in determining its alimony award. In support of his claim, the defendant relies on *Dan* v. *Dan*, 315 Conn. 1, 105 A.3d 118 (2014), in which our Supreme Court concluded that an increase in the supporting spouse's income after dissolution, standing alone, is insufficient to justify a modification of alimony when the initial award remains sufficient to fulfill the intended purpose of the award. Id., 11–14. The defendant argues that *Dan* stands for the broad principle that a supported spouse should not "benefit from the prosperity of the other spouse after the joint relationship has ceased" and that "there is no reason that the same rationale would not apply postseparation . . . ." He contends that the court's alimony award violated that principle because the award was "based simply on the fact that the defendant earned significantly more than the plaintiff at the time of dissolution . . . ."

The defendant's claim is foreclosed by this court's decision in *Panganiban* v. *Panganiban*, 54 Conn. App. 634, 736 A.2d 190, cert. denied, 251 Conn. 920, 742 A.2d 359 (1999), as well as *Dan* itself. In *Panganiban*, the husband, who was frequently unemployed and receiving public assistance during the marriage, won $16 million in a lottery, payable in installments of $800,000 each year, after the parties separated but before their marriage was dissolved. Id., 636–37. The trial court awarded the wife $6000 per month in alimony, and the husband appealed, claiming that the court erred in relying on his lottery winnings because "the alimony award [was] far above anything to which the [wife] had been accustomed, based on her station in life and standard of living." Id., 642. This court rejected that claim, concluding that "what a spouse can afford to pay for support and alimony is a material consideration in the court's determination as

to what is a proper order." (Internal quotation marks omitted.) Id., 642–43.

In *Dan*, the court concluded that it is improper for a trial court to grant an upward modification of alimony "when the *sole* change in circumstances is an increase in the income of the supporting spouse . . . ." (Emphasis in original.) *Dan* v. *Dan*, supra, 315 Conn. 14–15. In reaching that conclusion, the court expressly distinguished that case on the basis that it involved an initial award of alimony that was based on income earned prior to dissolution. See id., 14 n.11. Specifically, the court rejected the contention that *Panganiban* supported the trial court's authority to award an upward modification of alimony based solely on a postdissolution increase in income, concluding that *Panganiban* was distinguishable in part "because (1) the supporting spouse in *Panganiban* won the lottery *during the marriage*, [and] (2) the case involved an initial alimony award, not a modification . . . ." (Emphasis in original.) Id. Thus, *Dan* and *Panganiban* foreclose the defendant's claim that it is improper for a court to rely on a postseparation, but predissolution, increase in income when entering an initial alimony award.

Moreover, even if the defendant were correct that *Dan* applies to an initial award of alimony, the record does not support his claim that the court's alimony award was based solely on his postseparation increase in income. Rather, in accordance with its obligation to consider all of the factors set forth in § 46b-82 (a); see *Emrich* v. *Emrich*, supra, 233 Conn. App. 329; the court expressly stated that, in awarding the plaintiff alimony, it "[c]onsider[ed] the causes of the dissolution of the marriage, the length of the marriage, the parties' ages, health and station, the amounts and sources of their respective incomes, and the other pertinent factors set forth in . . . § 46b-82 . . . ." Because the court properly considered the factors required by § 46b-82, we conclude

that the court did not abuse its discretion in awarding the plaintiff alimony.

B

The defendant also claims that the court erred by awarding pendente lite alimony "retroactively" at the time of the dissolution. In support of his claim, the defendant relies on decisions of this court holding that alimony pendente lite orders may not be modified retroactively in the absence of a pending motion to modify. See, e.g., *Elliott* v. *Elliott*, 14 Conn. App. 541, 545, 541 A.2d 905 (1988). He argues that the rationale of those decisions "impl[ies] that a retroactive order on a pendente lite motion, decided for the first time at the time of dissolution, is equally improper" and that, "[i]n line with [those] authorities . . . the court's retroactive alimony determination lacks statutory authority."[16] We disagree.

General Statutes § 46b-83 (a) provides in relevant part that "[a]t any time after the return day of a complaint [in a dissolution action] . . . and after hearing, alimony . . . pendente lite may be awarded to either of the parties *from the date of the filing of an application therefor* with the Superior Court. . . ." (Emphasis added.) Thus, § 46b-83 (a) expressly allows a court to enter an award of pendente lite alimony effective "from the date of the filing of [the] application . . . ." Here, the plaintiff's first motion for alimony pendente lite was filed on February 16, 2021. The trial court found that the defendant was "unemployed except for sporadic part-time employment" until January, 2022. In entering the award of alimony pendente lite, the court explained that it made the award retroactive to January 31, 2022, because that "is the date of the [defendant's] commencement of employment with his current employer at approximately his

---

[16]The defendant also claims that, even if the court had authority to enter the alimony pendente lite order at the time of dissolution, the court abused its discretion because there was insufficient evidence to support the award. For the reasons discussed in footnote 15 of this opinion, the defendant's failure to provide us with a complete transcript of the proceedings precludes our review of this claim.

current rate" and noted that "[t]he date of retroactivity so ordered is almost one year later than the filing date of the plaintiff's first motion for pendente lite alimony on February 16, 2021." Because § 46b-83 (a) expressly permits the court to award pendente lite alimony from the date of the application, the court had the statutory authority to award pendente lite alimony retroactive to January 31, 2022.

The defendant's contention that the court lacked authority to decide the pendente lite motion at the time of the dissolution judgment is foreclosed by this court's recent decision in *Hallock* v. *Hallock*, supra, 228 Conn. App. 81. In *Hallock*, the defendant filed a motion for alimony pendente lite on July 2, 2020. Id., 87. At the time the dissolution trial commenced on October 24, 2021, the court had not ruled on the defendant's motion. Id., 88. In its memorandum of decision, the court declined to award alimony to either party and stated that it had "considered all pending motions in making this decision" and "resolve[d] all of them." (Internal quotation marks omitted.) Id., 89. The defendant subsequently filed a motion for articulation requesting that the court articulate "the specific pending motions it had resolved, as well as the reasoning and outcome of these motions." Id., 84. The court granted that motion and issued an articulation stating that it had "resolved pending motions not by independently resolving them but by rolling all issues into the trial." (Internal quotation marks omitted.) Id., 85.

On appeal, this court rejected the defendant's claim that the court erred by failing to address her pendente lite motion "in a separate and distinct manner prior to considering the final financial orders . . . ." Id., 86. We concluded that the court had "independently considered the claims made in the pendente lite motions filed by the defendant and incorporated its ruling on those motions in its final financial orders as part of the ultimate dissolution of the parties' marriage . . . ." Id., 91. We further concluded that the trial court is not required "to conduct separate hearings with respect to pendente lite issues if it considers these issues in deciding the permanent

orders as was done in this case. . . . Although our law provides a process to order temporary or pendente lite orders of alimony and support, it does not require that the court consider these motions as a condition precedent to making final orders." (Footnote omitted.) Id., 91–92. Accordingly, we reject the defendant's claim that the court lacked authority to award alimony pendente lite at the time of the dissolution judgment.[17]

## III

The defendant next claims that the court erred in its child support award by failing to include as income mandatory distributions that the plaintiff receives from an inherited individual retirement account (IRA) when calculating her income. We disagree.

The following facts and procedural history are relevant to this claim. In the plaintiff's financial affidavit, she

_____

[17] The defendant also argues that the plaintiff abandoned her initial February, 2021 pendente lite motion by (1) filing a second motion on October 28, 2022, that "[did] not indicate it was an amendment to her February, 2021 motion," and (2) filing a request on August 31, 2023, for the court to hold a hearing on her October, 2022 pendente lite motion without mentioning her February, 2021 motion. The defendant argues, therefore, that, if the court had the authority to award pendente lite alimony at the time of the dissolution judgment, the October, 2022 motion was the "controlling filing," and it was improper for the court to award pendente lite alimony retroactive to January 31, 2022.

Prior to trial, however, the plaintiff filed a proposed order expressly requesting that the court award alimony "retroactive back to the date of the first filing request (2021)." The plaintiff included an identical request in an updated proposed order that she filed on November 22, 2023. In her posttrial brief, the plaintiff noted that she had filed her first pendente lite alimony motion on February 16, 2021, and again requested that the court award alimony retroactive to that date. The defendant did not address alimony at all in his posttrial brief and, in his reply brief, argued only that the court "should deny [the plaintiff's] request for alimony, or in the event of granting it, should make it a minimal amount, and for a short period of time." The defendant never objected to the court considering the plaintiff's first pendente lite motion and did not argue that it would be improper to use that date as the retroactivity date. Given that the plaintiff consistently requested that the court award alimony pendente lite retroactive to the date of her initial motion, the record does not support the defendant's claim that the plaintiff abandoned that motion.

listed as a retirement asset an "inherited IRA" with a balance of approximately $65,000 and listed as "other income" approximately $41 per week that she receives from that IRA. In the defendant's financial affidavit, he listed as retirement assets an IRA with a balance of $133,000 and a 401 (k) with a balance of $13,700. At trial, the plaintiff testified that she inherited the IRA from her father in or around 2014. She further testified that she is required to take a minimum distribution from the IRA in the approximate amount of $2100 per year, that she withdraws the minimum amount as a lump sum once per year, and that she pays income taxes on the withdrawals.[18]

As discussed previously, the court found the presumptive child support payable by the defendant to be $569 per week and ordered the defendant to pay that amount to the plaintiff. In its memorandum of decision, the court noted that it considered the plaintiff's inherited IRA as an "asset in connection with its orders for the division of property and [did] not also include the distributions in the plaintiff's income for purposes of considering alimony and child support." In dividing the marital assets, the court ordered that the parties' "retirement assets shall be equalized" and ordered the defendant to transfer to the plaintiff the amount necessary to equalize the assets.

The defendant's claim requires us to interpret the Child Support and Arrearage Guidelines (guidelines) and, therefore, is a question of law subject to plenary review. See *Unkelbach* v. *McNary*, 244 Conn. 350, 357, 710 A.2d 717 (1998). "[W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision .

---

[18] An individual who inherits an IRA is required to take minimum distributions from the account each year. See 26 U.S.C. § 401 (a) (9) (B) (2024); 26 C.F.R. § 1.408-8 (a) (2025); see also *Clark* v. *Rameker*, 573 U.S. 122, 125, 134 S. Ct. 2242, 189 L. Ed. 2d 157 (2014) ("the owner of an inherited IRA . . . must either withdraw the entire balance in the account within five years of the original owner's death or take minimum distributions on an annual basis").

. . . In construing statutes,[19] [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citations omitted; footnote added; internal quotation marks omitted.) *Gentile* v. *Carneiro*, 107 Conn. App. 630, 640, 946 A.2d 871 (2008). Moreover, General Statutes § 1-2z provides that "[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

The guidelines require the court to "use the parents' net income, defined as gross income minus allowable deductions, as a basis for calculating the child-support obligation." A. Rutkin et al., 8 Connecticut Practice Series: Family Law and Practice (3d Ed. 2010) § 38:20, p. 313. The guidelines define gross income as "the average weekly earned and unearned income from all sources before deductions . . . ." Regs., Conn. State Agencies § 46b-215a-1 (11). The guidelines do not further define "earned and unearned income," but provide that gross income "includ[es] but [is] not limited to" twenty-two delineated items, one of which is "pension and retirement income." Id., § 46b-215a-1 (11) (A) (xiii).

There is no appellate precedent in Connecticut addressing whether a distribution from an inherited IRA

[19] In *Vickery* v. *Vickery*, 25 Conn. App. 555, 595 A.2d 905, cert. denied, 220 Conn. 919, 597 A.2d 344 (1991), this court held that the guidelines carry the force of statute because "the General Assembly incorporated the guidelines by reference in [No. 89-203 of the 1989 Public Acts] and mandated that the guidelines be considered" in all child support determinations. Id., 562.

constitutes income within the meaning of the guidelines, and the defendant does not cite any case law to support his claim that the court was required to include the plaintiff's mandatory distributions in calculating her income. Rather, the defendant relies solely on the fact that the definition of " '[g]ross income' " set forth in the guidelines includes "retirement income" and argues that "the court's exclusion of income directly contradicts guideline requirements without an authoritative basis to do so." Although not expressly stated, we understand the defendant's argument to be that, because an IRA is nominally a "retirement account," funds withdrawn from an IRA must constitute "retirement income" under the guidelines.

As an initial matter, we disagree with the defendant that funds withdrawn from an inherited IRA are "retirement income" within the meaning of the guidelines merely because an IRA is nominally a "retirement account." As the United States Supreme Court has recognized, "[i]nherited IRAs do not operate like ordinary IRAs" because, "[u]nlike with a traditional or Roth IRA, an individual may withdraw funds from an inherited IRA at any time, without paying a tax penalty."[20] *Clark* v. *Rameker*, 573 U.S. 122, 125, 134 S. Ct. 2242, 189 L. Ed. 2d 157 (2014). The owner of an inherited IRA also is not permitted to make contributions to the account and, therefore, does not receive the tax benefits normally attendant to owning an IRA. See 26 U.S.C. § 219 (d) (4) (2024); see also *Clark* v. *Rameker*, supra, 125. Thus, from the standpoint of the beneficiary, an inherited IRA

---

[20] The beneficiary is required to pay income tax on the amount withdrawn from the inherited IRA but is not required to pay the tax penalty as she would for early withdrawals from her own IRA or 401 (k). See 26 U.S.C. § 72 (t) (1) and (2) (A) (ii) (2024). The fact that the plaintiff is required to pay income taxes on the distributions from her inherited IRA does not impact whether those distributions are income for child support purposes. See *Jenkins* v. *Jenkins*, 243 Conn. 584, 593, 704 A.2d 231 (1998) ("[N]either the state nor federal tax code definition is controlling [in determining whether something is income for child support purposes]. Because the guidelines contain their own definition of gross income, it is that definition that is determinative.").

does not function as a retirement account but is more akin to a savings account from which the beneficiary can withdraw funds at her discretion.

Moreover, the plain meaning of the term "income" does not support the defendant's contention that mandatory distributions from an inherited IRA should be included in calculating income for purposes of the guidelines. In *Birkhold* v. *Birkhold*, 343 Conn. 786, 276 A.3d 414 (2022), our Supreme Court quoted approvingly the definition of "income" in Webster's Third New International Dictionary, which "defines 'income' as 'something that comes in as an increment or addition usu[ally] by chance . . . a gain or recurrent benefit that is usu[ally] measured in money and for a given period of time, derives from capital, labor, or a combination of both, includes gains from transactions in capital assets, but excludes unrealized advances in value: commercial revenue or receipts of any kind except receipts or returns of capital . . . .' Webster's Third New International Dictionary (2002) p. 1143 . . . ."[21] *Birkhold* v. *Birkhold*, supra, 797. Because the beneficiary of an inherited IRA has access to the entire balance and may withdraw funds from the account at any time without penalty, withdrawals from such an account are not an "addition . . . [or] a gain or recurrent benefit . . . ." (Internal quotation marks omitted.) Id. Thus, withdrawals from an inherited IRA do not qualify as income within the plain meaning of that term.

Case law from this court and our Supreme Court interpreting the term "income" in the guidelines also does not support the defendant's argument that mandatory withdrawals from an inherited IRA are "retirement income" merely because the account nominally is a retirement

---

[21] Although *Birkhold* involved a determination of the parties' income for purposes of alimony, our Supreme Court has instructed that consideration of such cases is appropriate in construing the term income for purposes of child support because "alimony and child support are issues that are entirely interwoven and require similar treatment" and "[t]he statutory provisions governing awards of alimony and child support employ many of the same criteria." (Internal quotation marks omitted.) *Unkelbach* v. *McNary*, supra, 244 Conn. 361 n.4.

account. In *Sheppard* v. *Sheppard*, 80 Conn. App. 202, 834 A.2d 730 (2003), for example, this court concluded that, even though the guidelines expressly define "gross income" to include " 'estate or trust income,' " not "all funds derived from an estate or trust qualify under that definition." Id., 213. This is because, as our Supreme Court has recognized, "[d]espite the generally expansive meaning of the term, not every receipt of funds will be considered income." *Birkhold* v. *Birkhold*, supra, 343 Conn. 797. Instead of applying a mechanical approach to the determination of whether a particular item constitutes income, our Supreme Court has instructed that we construe the term to effectuate the guidelines' goal of ensuring "that children should receive the same proportion of parental income that they would have received had the family remained intact." *Unkelbach* v. *McNary*, supra, 244 Conn. 357. To that end, our courts have looked to whether the item in question, "in effect, increase[s] the amount of a parent's income that is available for child support purposes." Id., 360.

As discussed previously, the plaintiff testified that she received her inheritance in 2014, some seven years before the parties separated and ten years before the dissolution judgment. At that point, the entire balance of the account belonged to the plaintiff, and the funds were available for her to use for any purpose and in any amount, as long as she withdrew at least the minimum amount per year required by federal law. Thus, any money the plaintiff withdraws from the account going forward does not result in a gain to her or increase her available resources. In that sense, aside from the tax burden associated with the mandatory withdrawals, when the plaintiff withdraws funds from her inherited IRA, it is no different than if she transferred funds from a savings account to a checking account; the funds are already hers and are available to her at any time. Put differently, the distributions that the plaintiff receives from her inherited IRA do not "increase the amount of income available for support purposes." Id., 362. Accordingly, we conclude that the court did not err in calculating the plaintiff's

income for purposes of determining the defendant's child support obligation.[22]

## IV

We next address the defendant's claim that the court erred in ordering him to secure and maintain a $700,000 life insurance policy for the benefit of the children as security for his child support obligations. The defendant contends that the order was improper because it requires him to maintain a policy in an amount that exceeds what he reasonably can expect to pay in child support for the duration of his obligation.[23] We disagree.

General Statutes § 46b-84 (f) (1) provides in relevant part: "After the granting of a decree annulling or dissolving the marriage or ordering a legal separation . . . the court shall inquire into the child's need of maintenance and the respective abilities of the parents to supply maintenance. The court shall make and enforce the decree for the maintenance of the child as it considers just, and may direct security to be given therefor, including an order to either party to contract with a third party for

---

[22] The defendant also asserts that, if the court properly excluded the mandatory distributions from the plaintiff's inherited IRA in calculating her income, it "still erred by including the plaintiff's retirement income tax deductions in its child support calculation." The guidelines, however, expressly provide that " '[a]llowable deductions' " include "either Social Security taxes or, in lieu thereof, mandatory retirement plan deductions for an amount not to exceed the maximum amount permissible under Social Security . . . ." Regs., Conn. State Agencies § 46b-215a-1 (1) (B). The defendant does not cite any authority to support his claim that the court should have disregarded the guidelines and refused to subtract the plaintiff's mandatory retirement deductions when calculating her net income. Accordingly, we reject the defendant's claim.

[23] The defendant also argues that the court erred because its order does not contain language permitting him to terminate the life insurance policy when his child support obligation ceases. As the plaintiff notes in her brief, however, the court's order expressly requires the defendant to maintain the life insurance policy only "for so long as there remains in effect a court-ordered obligation for child support or postmajority educational expenses or the court continues to have jurisdiction to enter such an order." We therefore conclude that the defendant's claim that his life insurance obligation "essentially exists in perpetuity" is not supported by the record.

periodic payments or payments contingent on a life to the other party. The court may order that a party obtain life insurance as such security unless such party proves, by a preponderance of the evidence, that such insurance is not available to such party, such party is unable to pay the cost of such insurance or such party is uninsurable." As with our review of the court's other financial orders, we review the court's order for a party to obtain life insurance as security for child support for an abuse of discretion "allow[ing] every reasonable presumption . . . in favor of the correctness of [the trial court's] action." (Internal quotation marks omitted.) *Lederle* v. *Spivey*, 113 Conn. App. 177, 194, 965 A.2d 621, cert. denied, 291 Conn. 916, 970 A.2d 728 (2009).

The defendant claims that the court's order was improper because it requires him to maintain a life insurance policy that exceeds the amount necessary to secure his child support obligations. Relying only on what he acknowledges is "a rough calculation" of the total amount he would be required to pay in weekly child support payments, the defendant argues that a $700,000 policy is excessive because, "[u]ntil both children reach the age of majority, [his] total anticipated child support obligation equates to $110,000 more or less." Even if we assume that the defendant is correct in his calculation, however, he acknowledges that it does not account for his share of the children's future medical, childcare, extracurricular, or postmajority educational expenses. The court ordered the defendant to maintain medical and dental insurance coverage for the children at his sole expense, to pay 68 percent of the children's unreimbursed medical and childcare expenses, and to pay 50 percent of the children's extracurricular expenses. The court also found "that it is more likely than not that the parents would have provided support to the children for higher education or private career school if the family were intact" and retained jurisdiction to enter postmajority educational support orders pursuant to General Statutes § 46b-56c.[24]

[24] General Statutes § 46b-56c permits a court, at the time of the dissolution judgment or at a later date if it retains jurisdiction to do so, to

The defendant does not provide any analysis or point us to any evidence in the record to support his claim that the life insurance order was excessive when considering those elements of his child support obligations. In light of the strong presumption of correctness that we afford the trial court's financial orders; see *Lederle* v. *Spivey*, supra, 113 Conn. App. 194; we conclude that the court did not abuse its discretion in ordering the defendant to maintain a $700,000 life insurance policy as security for his child support obligation.

## V

Finally, the defendant claims that the court erred in ordering him to pay $20,000 in attorney's fees to the plaintiff. The defendant contends that the court's award of attorney's fees was improper because there was insufficient evidence to establish (1) the reasonableness of the fee award, and (2) that the plaintiff lacked sufficient liquid assets to pay for her own attorney's fees.[25] We decline to review the defendant's claim.

As discussed previously; see footnote 15 of this opinion; when a claim requires us to determine whether the court's decision is supported by sufficient evidence, the appellant's failure to provide a complete transcript of the proceedings precludes our review of that claim. See *Calo-Turner* v. *Turner*, 83 Conn. App. 53, 56, 847 A.2d

enter orders "requiring a parent to provide support for a child or children to attend for up to a total of four full academic years an institution of higher education or a private career school for the purpose of attaining a bachelor's or other undergraduate degree, or other appropriate vocational instruction. . . ."

[25] Pursuant to General Statutes § 46b-62 (a), the trial court in a dissolution proceeding "may order either spouse . . . to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82. . . ."

"[A]n award of attorney's fees in a marital dissolution case is warranted only when at least one of two circumstances is present: (1) one party does not have ample liquid assets to pay for attorney's fees; or (2) the failure to award attorney's fees will undermine the court's other financial orders." (Internal quotation marks omitted.) *Dolan* v. *Dolan*, 211 Conn. App. 390, 405, 272 A.3d 768, cert. denied, 343 Conn. 924, 275 A.3d 626 (2022).

1085 (2004). Here, the defendant's claim would require us to assess whether there was sufficient evidence to support a finding either that the plaintiff "does not have ample liquid assets to pay for attorney's fees" or that "the failure to award attorney's fees will undermine the court's other financial orders." (Internal quotation marks omitted.) *Dolan* v. *Dolan*, 211 Conn. App. 390, 405, 272 A.3d 768, cert. denied, 343 Conn. 924, 275 A.3d 626 (2022). Because there were three days of trial for which the defendant did not provide a transcript, we have no way of knowing whether any testimony was presented during those days that would have shed light on either issue. Accordingly, we cannot assess the defendant's claim that the evidence was insufficient to support the court's award of attorney's fees.

Moreover, this court and our Supreme Court repeatedly have declined to review claims challenging an award of fees when the appellant failed to articulate its objection to the fee award before the trial court. See, e.g., *Smith* v. *Snyder*, 267 Conn. 456, 480–81, 839 A.2d 589 (2004) ("Although the proponent bears the burden of furnishing evidence of attorney's fees at the appropriate time, once the plaintiffs in this case did make such a request, the defendants should have objected or at least responded to that request. Had the defendants demonstrated any interest in objecting to the plaintiffs' request for attorney's fees, the trial court would have been obligated to grant the defendants an opportunity to be heard."); *Medeiros* v. *Medeiros*, 175 Conn. App. 174, 205, 167 A.3d 967 (2017) (declining to review claim that court abused its discretion by failing to consider plaintiff's ability to pay attorney's fees because "defendant not only failed to bring this objection to the attention of the court at the time that it considered the plaintiff's request for attorney's fees, but he also failed to raise any objection to that request"); *Dowd* v. *Dowd*, 96 Conn. App. 75, 87, 899 A.2d 76 (declining to review claim that evidence was insufficient to support award of attorney's fees when appellant "had notice of the affidavits [of fees], and was given the opportunity [to object] during the hearings and

in his postjudgment brief . . . [but] raised no objection to the fees presented"), cert. denied, 280 Conn. 907, 907 A.2d 89 (2006).

Here, the plaintiff filed proposed orders requesting that the court order the defendant to pay her $50,000 in attorney's fees and testified at trial that "$50,000 does not even begin to cover" what she paid her attorney. In her posttrial brief, the plaintiff argued that the court should award her attorney's fees because she "does not have ample liquid assets to pay for the cost of this litigation . . . and whatever support she gets from the defendant is substantially less than what she has paid for legal fees, thus undermining the court orders of child support." The plaintiff also filed with her posttrial brief an affidavit from her attorney attesting that the fees associated with preparing the posttrial brief alone amounted to $23,400. Although the defendant filed proposed orders prior to trial proposing that "[e]ach party shall be responsible to pay their own costs of counsel in connection [with] this dissolution of marriage action," the defendant did not address the issue of attorney's fees in his posttrial brief or reply brief and did not object to the affidavit of fees attached to the plaintiff's posttrial brief. See, e.g., *Florian* v. *Lenge*, 91 Conn. App. 268, 285, 880 A.2d 985 (2005) (rejecting claim that court deprived defendant of opportunity to object to request for attorney's fees when defendant failed to file objection in nearly two month period between plaintiff's filing of affidavit of fees and court's issuance of decision). We also note that, after the parties filed their posttrial briefs and reply briefs, the defendant filed a motion requesting the opportunity to present additional evidence on nineteen separate issues, including certain evidence that the defendant claimed would "refute" claims made by the plaintiff in her posttrial brief.[26] The defendant did not request the opportunity to challenge the affidavit of fees attached to the plaintiff's posttrial brief or otherwise challenge the plaintiff's request for a fee award. Accordingly, we

---

[26] The court denied the defendant's motion.

decline to review the defendant's claim that the court erred in its award of attorney's fees.

The judgment is affirmed.

In this opinion the other judges concurred.